Argued April 6, reversed September 21, petition for
rehearing denied October 17, 1972

GOHEEN ET AL, *Appellants, v.*
GENERAL MOTORS CORPORATION ET AL,
*Respondents.*

502 P2d 223

*Edwin J. Welsh,* Portland, argued the cause for appellants. ■

*Hugh L. Biggs,* Portland, argued the cause for respondent General Motors Corporation. ■

Jack, Goodwin & Anicker, James O. Goodwin, and Raymond R. Bagley, Jr., Oregon City, filed a brief for respondent Weiler Chevrolet Co.

Before O'CONNELL, Chief Justice, and DENECKE, *HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

■

TONGUE, J.

This is a declaratory judgment proceeding to

* Holman, J., did not participate in this decision.

determine the rights of the parties under the Oregon Wrongful Death Act, ORS 30.020, as the result of an automobile accident in which two nuns were killed. Both were members of the Sisters of the Holy Names of Jesus and Mary, a religious order which operates various schools. One nun was a qualified school administrator, while the other was a qualified school librarian, but neither earned or retained any earnings of money or property. Both had taken simple vows of poverty and also left wills under which Sisters was the sole beneficiary. Neither estate incurred any funeral, medical or hospital expenses.

The trial court held that the personal representatives of the estate of the two nuns had no rights of recovery by a proceeding under ORS 30.020 because Sisters was not a "dependent" within the meaning of that statute and because there was no "pecuniary loss" to the estate of the decedents, as also required under ORS 30.020, for the reason that neither decedent would have accumulated any net savings during her lifetime. We reverse.

To understand the reasons for this decision it is first necessary to state the contentions of the parties. Plaintiffs' primary contentions are that the trial court erred in denying recovery because decedents would never accumulate net savings; that under the Oregon Wrongful Death Act recovery has been allowed based on evidence of earning capacity, with no evidence of either prior earnings or that the decedents would accumulate future savings; that because decedents performed services of pecuniary value there was evidence of their earning capacity and their vow of poverty should be disregarded, and that if this court finds that no recovery can be permitted within the limits of the

rule announced by it in *Carlson v. Oregon Short Line Ry. Co.*, 21 Or 450, 28 P 497 (1892), it should re-examine that rule and adopt a modified measure of damages under which recovery would be based upon a decedent's earning capacity or capacity to render useful service to others.[1]

Defendants responded by contending that the rule measuring pecuniary loss to an estate for the purposes of ORS 30.020 by the net savings that would probably have been earned and accumulated by a decedent at the expiration of his normal life expectancy, as stated in *Carlson,* has been long established and repeatedly reaffirmed by this court and that the "earning capacity" or "capacity to render useful service" of these decedents "cannot be relevant here in determining the actual pecuniary loss to the estate because of the admitted facts that decedents could not earn or retain from earnings any money or property, and that their next-of-kin would not reasonably have expected any money benefit from the continued life of decedents."

To understand the full significance of these conflicting contentions, it is necessary to review the origin and history of actions for wrongful death and of the Oregon Wrongful Death Statute, ORS 30.020, including the decisions of this court under that statute, and setting forth not only what this court has said in those decisions, but what was actually decided and done in those cases.

---

[1] Plaintiffs also contended that Sisters was a "dependent" of decedents within the meaning of ORS 30.020; that there is also a common law right of recovery in such a case, and that a denial of recovery would violate constitutional guarantees of due process and equal protection.

■ *Denial of common law remedy for wrongful death —Adoption of Lord Campbell's Act and similar state statutes.*

It has been said that "* * * [w]rongful death cases have long been the stepchildren of tort litigation" and are only now "starting to emerge from the wilderness to which Lord Ellenborough consigned them in his much disputed decision of 1808 in *Baker v. Bolton.*"[2] As also stated by Prosser:[3]

"* * * Lord Ellenborough, whose forte was never common sense, held without citing any authority that a husband had no action for loss of his wife's services through her death, and declared in

---

[2] Speiser, Recovery for Wrongful Death iii (1966), citing Baker v. Bolton, 1 Camp 493, 170 Eng Rep 1033 (Nisi Prius 1808).

[3] Prosser on Torts 901, § 127 (4th ed 1971). Previously in 1607, it had been held in Higgins v. Butcher, Yelv 89, 80 Eng Rep 61 (KB 1607), that a civil action at law for assault on plaintiff's wife, causing her death, could not be maintained, apparently upon the ground that where a cause of action disclosed the commission of a felony, the civil action was "merged" in the criminal wrong. Malone, The Genesis of Wrongful Death, 17 Stan L Rev 1043, 1056-57 (1965). Indeed, at that time, upon the commission of a felony, all property of the felon was forfeited to the Crown, leaving nothing from which the victim could secure compensation. Speiser, Recovery for Wrongful Death, *supra* at 5, § 1:2. It appears, however, that there was no mention of the felony-merger doctrine in Baker v. Bolton, *supra*. Malone, The Genesis of Wrongful Death, *supra* at 1058. In any event, the felony-merger doctrine could have had no proper application in Baker v. Bolton, *supra*, because no felony was involved in that case, in which plaintiff sued the owners of a stagecoach which overturned, causing the death of his wife. Speiser, Recovery for Wrongful Death, *supra* at 2-7, §§ 1:1, 1:2.

"Thus, it is clear that the rule in Baker v. Bolton was not based on precedent or logic. But the fault is not Lord Ellenborough's alone. The fault lies with those judges who followed the rule without questioning or closely examining it." Id. at 7, § 1:2.

See also discussion of *Baker v. Bolton* in Moragne v. States Marine Lines, 398 US 375, 382 (1970), and Smedley, Wrongful Death— Bases of the Common Law Rules, 13 Vand L Rev 605, 613-19 (1960).

broad terms that 'in a civil court the death of a human being could not be complained of as an injury.' * * *"

Meanwhile, the American courts allowed recovery for wrongful death.[4] In 1848, however, the Massachusetts Supreme Court in *Carey v. Berkshire RR Co.*,[5] ignored earlier decisions by American courts to the contrary and cited and adopted the rule as stated in *Baker v. Bolton*. Since then most American courts, including this court, have adopted the rule holding that there is no common law cause of action for wrongful death.[6] In the light of this historical background, however, it is understandable that legal writers have been critical of the almost universal rule that there is no common law remedy for wrongful death.[7]

---

[4] Malone, The Genesis of Wrongful Death, *supra,* 1062-67, and cases cited therein. See also Prosser on Torts, *supra* at 902. As also stated in Moragne v. States Marine Lines, *supra* at 384, the historical justification for the rule in England, the felony-merger doctrine, never existed in America. It is also of interest that in civil law countries, and also in Scotland, recovery of damages for wrongful death has long been recognized. Voss, Recovery of Damages for Wrongful Death at Common Law, at Civil Law, and in Louisiana, 6 Tul L Rev 201, 212-18 (1932); Malone, The Genesis of Wrongful Death, *supra* at 1054-55.

[5] 55 Mass (1 Cush) 475, 48 Am Dec 616 (1848); Malone, The Genesis of Wrongful Death, *supra,* 1067-69.

[6] Malone, The Genesis of Wrongful Death, *supra* at 1067-72. See also Speiser, Recovery for Wrongful Death, *supra* at 7, § 1:3, and Moragne v. States Marine Lines, *supra* at 389, and cases cited therein. As pointed out, however, by Malone, The Genesis of Wrongful Death, *supra* at 1073, most of these cases were decided after the adoption of state wrongful death statutes and demonstrated a "reluctance" to recognize any common law right that would compete with the provisions of such statutes.

Among Oregon cases to the same effect, see Perham v. Portland Electric Co., 33 Or 451, 458-62, 53 P 14 (1898); Piukkula v. Pillsbury Flouring Co., 150 Or 304, 312, 42 P2d 921, 44 P2d 162 (1935); Cowgill, Adm'r v. Boock, Adm'r, 189 Or 282, 288, 218 P2d 445 (1950); and Richard v. Slate, 239 Or 164, 167, 396 P2d 900 (1964).

[7] Among others, see Speiser, Recovery for Wrongful Death,

One of plaintiffs' contentions in this case is that this court should now right this ancient wrong and adopt the rule that in Oregon there is such a remedy at common law in cases not covered by the terms of its Wrongful Death Act, ORS 30.020. Thus, plaintiffs cite the recent decision by the Supreme Court of the United States in *Moragne v. States Marine Lines,* 398 US 375 (1970), in which that court held (at p 402) that there is a remedy for wrongful death under "general maritime law" in cases not covered by the Death on the High Seas Act, 46 USC §§ 761, 762. In doing so that court (at p 409) reversed its previous decisions to the contrary.

Although there may be some merit in that view, our own previous decisions are to the contrary,[*] and we prefer to rest our decision in this case on other grounds.

As a result of the injustice inherent in the absence of a common law right of action for wrongful death, particularly under the changes in conditions resulting from the industrial revolution, Lord Campbell's Act was adopted in England in 1846.[*] That Act

*supra* at 9-12, § 1:5-6; Prosser on Torts, *supra* at 902, § 121; Malone, The Genesis of Wrongful Death, *supra;* and Tiffany, Death by Wrongful Act (2d ed) 16, § 12. Prosser on Torts, *supra* at 902, states that "[t]he result was that it was more profitable for the defendant to kill the plaintiff than to scratch him," adding, as a footnote, that "* * * [m]ost lawyers are familiar with the legend, quite unfounded, that this was the original reason that passengers in Pullman car berths rode with their heads to the front."

[*] Among other cases, see Perham v. Portland Electric Co., 33 Or 451, 458-59, 53 P 14 (1898); Piukkula v. Pillsbury Flouring Co., 150 Or 304, 312, 42 P2d 921, 44 P2d 162 (1935); Cowgill, Adm'r v. Boock, Adm'r, 189 Or 282, 288, 218 P2d 445 (1950); and Richard v. Slate, 239 Or 164, 167, 396 P2d 900 (1964). See also Hansen v. Hayes, 175 Or 358, 154 P2d 202 (1944).

[*] See Speiser, Recovery for Wrongful Death, *supra* at 12, § 1:7; Malone, The Genesis of Wrongful Death, *supra* at 1043; and Voss, Recovery of Damages for Wrongful Death, *supra* at 205.

provides that whenever the death of any person is caused by the wrongful act of another an action for damages may be maintained in the name of decedent's executor or administrator for the benefit of certain named relatives, including the wife, husband, parent and child.[⑩] The Act, by its terms, does not expressly limit such damages to pecuniary damages, but has been so interpreted by the courts.[⑪]

Lord Campbell's Act was followed in the United States by the adoption of similar state statutes. These various statutes differ widely and since we decide this case under the terms of the Oregon Statute, ORS 30.020, it would serve no useful purpose to discuss the various types of wrongful death statutes, as adopted in the various states.[⑫] Many states, however, have adopted statutes which provide a remedy for loss to the estate of the decedent, as well as for loss to members of his immediate family.[⑬]

2. *The Oregon Wrongful Death Act, as interpreted and as amended.*[⑭]

The original Oregon Wrongful Death Act was

---

[⑩] 9 and 10 Vict ch 93. See also, Speiser, Recovery for Wrongful Death, *supra*, 12, § 1:7 and 773, Appendix A.

[⑪] Speiser, Recovery for Wrongful Death, *supra* at 54-55, § 3:1, and Prosser on Torts, *supra* at 907. See also Johnson, Wrongful Death and Intellectual Dishonesty, 16 SDak L Rev 37 (1971), pointing out that:

 " 'Parliament didn't say pecuniary loss; the judges said it.' " Id. at 45.

[⑫] For discussion of various types of state statutes, see Speiser, Recovery for Wrongful Death, *supra*, 63, § 3:2.

[⑬] See Speiser, Recovery for Wrongful Death, *supra* at 63, § 3:2, and Comment, Damages in Wrongful Death and Survival Actions, 29 Ohio St L J 420, 421-24 (1968).

[⑭] The present act, ORS 30.020, reads as follows:

 "When the death of a person is caused by the wrongful act

included in the original Deady Code in 1862.® Its terms were similar to those of the Lord Campbell's Act, but did not specifically limit awards of damages to any named dependents. Neither did it specifically limit damages to pecuniary loss, although total recovery was limited to $5,000. This limitation on the amount of recovery was increased from time to time,® and was finally removed completely.®

or omission of another, the personal representatives of the decedent, for the benefit of the surviving spouse and dependents and in case there is no surviving spouse or dependents, then for the benefit of the estate of the decedent, may maintain an action against the wrongdoer, if the decedent might have maintained an action, had he lived, against the wrongdoer for an injury done by the same act or omission. Such action shall be commenced within three years after the occurrence of the injury causing the death of the decedent, and in every such action such damages may be awarded as, in all the circumstances of the case, may be just, and will reasonably and fairly compensate the spouse, dependents or estate for the actual pecuniary loss, if any, to such spouse, dependents or estate and for all reasonable expenses paid or incurred for funeral, burial, doctor, hospital or nursing services for the decedent."

[Amended by 1953 c. 600 § 3; 1961 c. 437 § 1; 1967 c. 544 § 1]

® Deady, General Laws of Oregon 1845-1864, § 367. The original statute read as follows:

"When the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action at law therefor against the latter, if the former might have maintained an action, had he lived, against the latter, for an injury caused by the same act or omission. Such action shall be commenced within two years after the death, and the damages therein shall not exceed five thousand dollars, and the amount recovered, if any, shall be administered as other personal property of the deceased person."

For the terms of the present statute, ORS 30.020, see note 14.

® 1907—increased to $7,500. Oregon Laws 1907, ch 72, p 128.
1929—increased to $10,000. Oregon Laws 1929, ch 354, p 408.
1949—increased to $15,000. Oregon Laws 1949, ch 518, p 815.
1953—increased to $20,000. Oregon Laws 1953, ch 600, § 1, p 1124.
1961—increased to $25,000. Oregon Laws 1961, ch 437, § 1, p 722.

® Oregon Laws 1967, ch 544, § 1, p 1317.

In 1939, the statute was amended to provide for a distinction between recovery for the benefit of the "widow or widower and dependents" and for recovery "in case there is no widow or widower, or surviving dependents," for the benefit of the estate of the deceased.[18]

In the absence of such a specific provision in the original act, the measure of damages in all actions under the act was the pecuniary damage to the estate, whether or not there were such "dependents." For that reason, and because this is an action for the benefit of an estate in which there are no such "dependents,"[19] the decisions of this court under the original act are still recognized to be of particular significance in actions brought for damage to the estate of the decedent, as in this case.[20] Further reasons why decisions under the original act are still of particular significance are that the rule for the measure of damages in wrongful death cases, as stated in *Carlson v. Oregon Short Line Ry. Co.*, 21 Or 450, 456, 28 P 497 (1892), is one of the focal points of this case and the decision of this court in *Scott v. Brogan*, 157 Or 549, 73 P2d

[18] Oregon Laws 1939, ch 466, p 916.

[19] As previously stated, plaintiffs contend that "Sisters" is a "dependent" within the meaning of ORS 30.020. Despite some logical reasons for such a result, it has been so well established that only members of the family of the decedent can be such "dependents" that we reject that contention. In any event, we prefer to rest our decision in this case on other grounds.

[20] For an excellent discussion of the law under the Oregon Wrongful Death Act see Kester, Procedure in Wrongful Death Actions, 29 Or L Rev 31 (1949). As stated in Hansen v. Hayes, 175 Or 358, 391, 154 P2d 202 (1944), if under the statute as amended in 1939, there were no spouse or dependent, the action was still brought for the benefit of the estate and "* * * the damages would be measured by the 'benefit of the estate rule' as established in the cases which arose under the death by wrongful act statute prior to its amendment in 1939."

688 (1937), was given particular consideration by the 1967 Legislature as setting forth the law as then understood by it to be still controlling and to be unchanged by the amendments adopted in 1967.[⊕]

a. *Cases decided under original act prior to 1939 amendments.*

In 1880 Judge Deady, in *Holmes v. Or. & Cal. Railway Co.,* 6 Sawyer 262 (D Or 1880), sitting in admiralty, without a jury, awarded $1,000 for the death of a 22-year-old man who was unmarried, but left a mother, and who was drowned while getting off defendant's ferry across the "Wallamet" River at Portland. In making that award Judge Deady recognized (at pp 294-95) that:

"* * * He had no trade or calling by which to earn anything, save that of a common laborer, and the decided weight of the evidence is that he was indolent or inefficient and inclined to intemperance.
* * *

"Earning as he might, if he would, three hundred or four hundred dollars a year, it is not probable that he *could* furnish his mother more than one hundred dollars a year of it." (Emphasis added)

In *Holmes* it was also stated (at pp 293-94) that:

"Under similar statutes of other states, it has been generally held, that the rule upon which damages should be assessed in this class of cases is, as for a pecuniary injury, and not a *solatium,* or solace for wounded feelings or mental suffering.
"* * * * *

"The age, health, habits of industry and sobriety, and mental and physical skill of the deceased, so far as they affect his *capacity for rendering useful*

---

[⊕] See subsequent discussion of 1967 amendments and their legislative history.

*service to others,* or acquiring property, must also be considered.

"Under the statute, *the life of the deceased is valued according to his capacity and disposition to be useful—to labor and to save.*" (Emphasis added)

Judge Deady then stated (at p 294), with remarkable perception:

"This is the law, and as will be seen, it makes no account of sentiment or feeling; and yet while it is administered by fallible human beings, whether on the bench or in the jury box, the chances are that a feeling of pity for the bereaved or indignation for the wrong will creep into the estimate and swell the damages beyond the strict legal limit."[20]

It is thus evident that in awarding $1,000 in such a case, Judge Deady did not consider the court to be bound to deny all relief because of the absence of evidence that decedent "would" probably earn and save enough to accumulate any net savings, much less make any substantial contributions to the support of his mother. On the contrary, the court considered as controlling what decedent "could" contribute to his mother's support, i.e., his earning capacity.

*Carlson v. Oregon Short Line Ry. Co.*

Twelve years later, in *Carlson v. Oregon Short Line Ry. Co., supra* at 457-58, this court stated the fol-

[20] In *Holmes,* Judge Deady also considered (at p 266) the contention that at common law no action could be maintained for wrongful death. He then reviewed (at pp 267-268) Higgins v. Butcher, *supra*; Baker v. Bolton, *supra*; and Carey v. Berkshire Railway Co., *supra*, among other cases, as well as the criticism of those cases, including the observation in Cutting v. Seabury et al, 1 Sprague 522 (D Mass 1860), that although the weight of authority was against such an action, " 'natural equity, and the general principles of law are in favor of it.' " *Holmes, supra* at 268. He held, however (at p 269), that it was "unnecessary to consider this point further, as the libelant claims to recover under the statute of this state."

lowing rule, after citing and quoting from *Holmes* with approval:

"After a careful and attentive examination and review of the authorities, we are of the opinion that the proper measure of damages under our statute is the pecuniary loss suffered by the estate without any *solatium* for the grief and anguish of surviving relatives, or pain and suffering of the deceased, and that loss is what the deceased *would have probably earned* by his intellectual or bodily labor in his business or profession during the residue of his life, and which, *as representing his net savings, would have gone for the benefit of his estate,* taking into consideration his age, ability and disposition to labor, and his habits of living and expenditure. *This is substantially the law as given by the court in this case.*" (Emphasis added)

Because *Carlson* has been subsequently cited as establishing a rule which limits recovery in wrongful death cases to the *net savings* which the decedent *would* have accumulated and left to his estate at the expiration of his life expectancy, it is of interest to examine more closely the *Carlson* case and subsequent cases which have repeated the same rule. A further reason for doing so is the need to avoid, if possible, unfortunate results similar to those resulting from the slavish adherence by previous courts to the rule of *Baker v. Bolton,* despite the demonstrated error of that decision.

First, it is to be noted that the issue before the court in *Carlson* which gave rise to the statement of the foregoing rule was *not* whether the trial court erred in giving an instruction which stated any different or broader rule for recovery. Instead, this court held (at p 458) that the instruction by the trial court was not in error because it was "substantially" the same as set forth in that statement.

Next, it is important to note from an examination of the briefs in *Carlson* that no contention was made by the defendant-appellant that the rule as stated by the trial court in its instruction was improper as a correct statement of law. Indeed, defendant conceded that plaintiff's *earning power* was one of the elements of damages to be considered by the jury.[28] On the contrary, the primary objection by defendant to the instruction as given by the trial court was that there was *insufficient evidence* to justify the giving of such an instruction or to support the jury verdict of $3,000 and that it was an excessive verdict.[29] Thus, defendant contended that the only testimony was that decedent was an unskilled laborer who "could" earn $2 a day, and did so "sometimes," and that his total assets on death were valued at only $250.[30]

In *Carlson,* however, this court rejected that contention. Although the court stated (at p 459) that "the

[28] App Br 104.

[29] App Br 98-108.

[30] See App Br 98, 101. Defendant also contended that "there was no proof that there was either a widow or children or anyone who had any pecuniary interest in whatever moneys might have been acquired and saved by the deceased." App Br 104. The court also rejected that contention, holding, at p 459:

"By force of section 371, the personal representative, in the prosecution of the action and the distribution of the proceeds, represents collectively all who are interested in the continuance of the life, whether as credits, heirs, *or distributees.* The heirs or distributees have no interest in the recovery by right of action for a pecuniary injury sustained by them but only by virtue of kinship; and if the expenses of administration and debts of the deceased equal or exceed the assets of the estate, which include the damages recovered, the next of kin get no benefit from the right of action. The difference in the two classes of cases is between the damage done to the estate and the damage done to the designated persons. That to the estate, is measured as nearly as can be by the value of the life lost, and that to the beneficiaries by the value of the life lost to them. * * *" (Emphasis added)

value of the life lost" to an estate "is represented by the probable accumulated net savings of the deceased," what the court actually held was that plaintiff was entitled to have that case submitted to a jury despite the fact that the evidence in that case, when viewed as a practical matter, demonstrated no more than decedent's *earning capacity* at the time of his death, rather than that he *would* have accumulated any substantial *net savings.* The court also stated (at p 457) that "[t]here is an inherent difficulty in placing a pecuniary value upon human life"; that in such an action the amount of recovery "must depend very much on the good sense and sound judgment of the jury, upon all the facts and circumstances of each particular case," and despite some "degree of speculation and uncertainty."

Finally, and of equal importance, is the fact that in *Carlson* this court quoted with approval (at p 456-57) from the decision by Judge DEADY in *Holmes v. Or. & Cal. Railway Co., supra,* including its specific reference to decedent's *"capacity* for rendering useful services to others, *or* acquiring property."

When viewed in the light of these circumstances, and considering what was actually decided and done in *Carlson,* that decision cannot properly be regarded as a case which rejected evidence of *earning capacity* (or "the capacity to render useful service to others," as stated in *Holmes*) as sufficient evidence for consideration by the jury in determining the "pecuniary value of the life lost" in an action on behalf of a decedent's estate. On the contrary, in *Carlson* there was no evidence that the decedent would, in fact, have accumulated any substantial "net savings" at the ex-

piration of his life expectancy and the evidence was to the contrary.[69]

*Other pre-1939 cases—Scott v. Brogan.*

An examination of our subsequent decisions leads us to the further conclusion that although this court has, on occasion, quoted with approval the rule as previously stated in *Carlson,* including its purported requirement of accumulated net savings, it has never done so as the basis for a decision holding that a decedent is not entitled to have his case submitted to the jury under Oregon's Wrongful Death Act, now ORS 30.020. Indeed, in some 70 decisions by this court in which actions have been brought under, or reference has been made to, what is now ORS 30.020, we have been unable to find any case in which recovery has been denied when the evidence has shown no more than *earning capacity* despite evidence that, as a practical matter, the decedent would never have accumulated any substantial "net savings."[70]

[69] See note 25. It is also important to note that in *Carlson* this court recognized (at p 459) that under the original statute an action for wrongful death could be brought by the personal representatives of decedent's estate under the Oregon statute not only for the benefit of members of decedent's family, but that where there were no such dependents the action could nevertheless be maintained by him for the benefit of "distributees" under decedent's will or for the benefit of his creditors.

As also held later in Perham v. Portland Electric Co., 33 Or 451, 464, 53 P 14 (1898) (quoting with approval from another decision by Judge Deady):

"'The action given by the statute is for death simply. This includes, of course, all such losses to his estate, or creditors and next of kin to whom it belongs, and for whose benefit the action is allowed, as may be fairly implied from the cessation of his life. The fact on which the damages are computed is death and its consequences, and not its antecedents or cause.'"

[70] For somewhat similar references in actions under the Ore-

Among these cases, some are of particular significance. In *Skottowe v. O.S.L. etc Ry. Co.,* 22 Or 430, 30 P 222 (1892), *aff'd on other grounds* 162 US 490, 16 S Ct 869, 40 L ed 1048 (1896), decided six months after *Carlson,* the converse of the situation in that case was presented. Thus, in *Skottowe,* this court rejected the contention that there could be no recovery in an action for the wrongful death of a wealthy man who was over 60 years of age (according to appellant's brief) and who lived on his income and would not have accumulated any additional net savings during the remainder of his normal life expectancy. It was held, however (at p 451), that decedent's "skill in the management of wealth, or *capacity* to manage affairs, * * * would be of advantage to an estate, and the loss of which would prove a detriment to it." Thus, this court held, in effect, that whether a decedent was poor or wealthy, young or old, and despite clear evidence that he would have "accumulated" either no substantial net savings, or no additional net savings, between the date of his death and the expiration of his normal life expectancy, if decedent had either an earning capacity or a capacity to manage his business affairs, the personal representative of his estate was entitled to have the case submitted to a jury.

The decision of this court in *Scott v. Brogan,* 157 Or 549, 73 P2d 688 (1937), is of even greater importance because of specific references to that case by

gon Employers Liability Act, now ORS 654.305-.335, to the "capacity for earning money or rendering services to others, or accumulating property," see McClaugherty v. Rogue River Electric Co., 73 Or 135, 162, 140 P 64, 144 P 569 (1914), *rev'd on other grounds,* 175 Or 358, 387-88, 154 P2d 202 (1944), and Kuntz v. Emerson Hardware Co., 93 Or 565, 579, 184 P 253 (1919), *rev'd on other grounds,* 175 Or 358, 387-88, 154 P2d 202 (1944).

legislative committees in the preparation of amendments to the Oregon statute in 1967, as discussed later. The decedent in that case was a 43-year-old widow and the mother of nine children, six of whom were minors. Plaintiff's testimony was that decedent was industrious, thrifty, and a good housekeeper; that she received $48 per month from relief agencies; that with these funds and "through her labor and efforts at home" she was able to provide food, clothing and shelter for her children. Although remanding the case for a new trial for failure of the trial court to give an instruction based upon the rule of the *Carlson* case, including its reference to probable "net savings" during the remainder of decedent's life, the court affirmed the denial of a directed verdict. In so holding, this court recognized (at p 555) that under the original Oregon statute the damages to be awarded were not to be " 'measured by the value of the life taken to the particular person entitled to the benefit of the statute,' " as under Lord Campbell's Act, and similar statutes, but " '*belong to the estate, and are co-extensive with the value of the life lost, without regard to its value to any particular person,*' " as measured by " 'earning capacity,' " among other factors, " 'and the consequent amount of probable accumulations during the expectancy of such life.' "

Nevertheless, and despite a complete lack of evidence that this 43-year-old widow and mother of nine children would acquire any "probable accumulations during the expectancy of [her] life," the court held that defendant was not entitled to a directed verdict and that plaintiff was entitled to have the case submitted to a jury, pointing out (at p 558) (quoting from another case) that:

" 'While, as has been said, there is great diffi-

culty in determining the value of a life, yet the amount of compensation to be recovered in actions of this nature is a question for the jury and not a question of law for the court.' "[29]

As further authority the court also quoted with approval from its previous decision in *Rekdahl v. Cheney,* 134 Or 251, 293 P 412 (1930), in which a verdict of $2,500 for the death of an eight-year-old child was affirmed, rejecting defendant's contention that the evidence was inadequate on the question of damages. In so holding, the court stated (at p 253) that to adopt such a contention "would have the effect of holding that there can be no substantial recovery where children are the victims because, at the time, they had no earning capacity," and that "[t]he statement of such a rule carries its own refutation."

These decisions under Oregon's original Wrongful Death Act, under which it was required that pecuniary damages to a decedent's estate must be shown in all cases, including those involving spouses and children, demonstrate that although this court continued to restate the rule of *Carlson* requiring proof of what decedent *would* have accumulated in net savings, the court did not apply that rule according to its terms. On the contrary, this court held that upon evidence

[29] To the same effect, it was held in Gillilan v. Portland Crematorium Assn., 120 Or 286, 249 P 627 (1926), also involving the death of a wife and mother (at p 295):

"* * * Of course, there was more or less speculation in determining the probable net earnings of this woman. Life is, indeed, uncertain. We prosper to-day and lose to-morrow. As stated in *Rorvik v. North Pac. Lumber Co.,* 99 Or. 58 (190 Pac. 331). 'There is no absolute method of computing the damages in a case of this kind.' Much must be left to the discretion of the jury. The court, in instructing the jury as to the measure of damages, followed by the rule announced in *Carlson v. Oregon Short Line Ry. Co.,* 21 Or. 450 (28 Pac. 497). There is no basis for complaint in that respect."

that a decedent had earning capacity alone (as in *Carlson, Skottowe,* and *Scott*) or potential earning capacity (as in *Rekdahl*), the personal representatives of decedent were entitled to have the case submitted to a jury for determination by it of the pecuniary value of decedent's life, despite evidence that decedent would never, in all probability, have accumulated any (or any further) substantial "net savings" during the remainder of his life expectancy.

b. *The 1939 Amendments to the Oregon Wrongful Death Act.*

In 1939 the Oregon Legislature, perhaps in recognition of the problems confronted by this court in wrongful death cases in which the decedent left a husband, wife, children, or parents, amended the Oregon Wrongful Death Act by specifically providing that a proceeding under that Act might be maintained "for the benefit of the widow or widower and dependents and in case there is no widow or widower, or surviving dependents, then for the benefit of the estate of the deceased."[29]

Because, under the original statute, it had been held in *Carlson* that the measure of damages was the pecuniary loss to the estate, measured by the probable net savings during the remainder of his life expectancy, the loss to any particular survivor, whether widow, widower, children, or parents, was immaterial.[30] After

---

[29] Oregon Laws, 1939, ch 466, p 916. At the same time, the legislature deleted the provision that "the amount recovered, if any, shall be administered as other personal property of the deceased person." Unfortunately, no legislative history of any substantial assistance is available relating to the deliberations of the legislature or its committee on this measure.

[30] Kester, Procedure in Wrongful-Death Actions, *supra* at 33.

the 1939 Amendments, however, the statute had two distinct aspects, with two different rules for determining damages, depending upon whether or not there was a surviving spouse or dependent.[31] If so, the action was for the benefit of that person and the measure of damages was the loss to that person in terms of the pecuniary value of the benefits which that person might reasonably have expected to derive from the continued life of the decedent (the "loss to the beneficiary" rule).[32] If, however, none of the named beneficiaries survived, the recovery was for the benefit of the estate, as under the original statute, and the measure of damages was still "established in the cases which arose under the death by wrongful act statute prior to its amendment in 1939."[33] Thus, under the "loss to the estate" rule, the measure of damages in such cases remained subject to the rule of *Carlson* that the loss to an estate is measured by probable net savings during the remainder of decedent's life expectancy, as modified in actual application by what was decided and done in *Carlson*, as well as by the effect of decisions such as those in *Skottowe*, *Scott* and *Rekdahl*.

Soon after adoption of the 1939 Amendments, this court was again presented with a practical problem similar to that presented in those cases, but in a case in which the decedent was a seven-year-old girl and the action was brought by her father as the administrator of her estate. *Lane v. Hatfield*, 173 Or 79, 143 P2d 230 (1943). Because the father was not a

---

[31] See Kester, Procedure in Wrongful-Death Actions, *supra* at 34, and Hansen v. Hayes, 175 Or 358, 380-83, 390, 154 P2d 202 (1944). See also Comment, 1 Will L J 128 (1959).

[32] Hansen v. Hayes, *supra* at 386, 390-91.

[33] Hansen v. Hayes, *supra* at 391.

named beneficiary (i.e., spouse or dependent) the measure of damages was necessarily the pecuniary loss to decedent's estate, as under the original statute, although the parents would have been beneficiaries of any amount allowed.[29] After considering this problem, this court affirmed a jury verdict of $5,000 and in doing so said (at p 89):

> "The rule, that the *measure of recovery* by a personal representative for the wrongful death of his decedent *is the value of the life of such decedent* if he had not come to such untimely end, has been termed vague, uncertain and speculative if not conjectural. It is, however, the best that judicial wisdom has been able to formulate." (Emphasis added)

This decision has been cited in Prosser on Torts, *supra* at 909, § 127, as one of many wrongful death cases in which "the court has benevolently [winked] at a flagrant violation of the rule it has laid down."[30] We prefer, however, to recognize that decision as one which recognizes that all human life has "pecuniary value" in terms of either actual or potential earning capacity, and as a case in which the question to be decided was pecuniary value of the life of a child—a question properly submitted to the jury

---

[29] See also Escobedo v. Ward, 255 Or 85, 98, 464 P2d 698 (1970).

[30] Similarly, 2 Harper & James, The Law of Torts 1331, § 25.14, states that the "justification" of jury awards in death cases involving children is a "fiction." As also stated by Prosser on Torts 908-09, § 127 (4th ed 1971):

> "* * * As any parent is well aware, any realistic view of the prospects must mean that the cost of rearing the child will far exceed any conceivable pecuniary benefits that might ever be optimistically expected of him; and damages honestly calculated on this basis could never be anything but a minus quantity. * * *"

See also Johnson, Wrongful Death and Intellectual Dishonesty, 16 S Dak L Rev 36 (1971).

for determination under the authority of *Skottowe,* *Scott* and *Rekdahl,* despite the rule as stated in *Carlson.*[69]

c. *The 1967 Amendments to the Oregon Wrongful Death Act.*

In 1967 the Oregon Legislature adopted, as House Bill 1603, further amendments to the Oregon Wrongful Death Act.[70] In doing so, the legislature re-

---

[69] As also stated in Speiser, Recovery for Wrongful Death, *supra,* 342, § 4:25:

"In a number of cases the law has presumed a pecuniary loss to the father or to the parents, from the wrongful death of a minor child.

"As to the necessity for specific proof of value of lost benefits and cost of maintenance, the cases state that it is not necessary to introduce specific evidence of pecuniary loss in order to make a case authorizing the jury to award substantial damages for the death of a minor. A sufficient case is established by showing the child's age, sex, physical and mental condition, and relations with and attitude toward his parents, together with evidence concerning the parents' ages, health, life expectancy and circumstances in life. * * *"

For reference to numerous decisions by other courts affirming but sometimes reducing, jury verdicts in death cases involving children, see Lane v. Hatfield, 173 Or 79, 90-92, 143 P2d 230 (1943). See also Speiser, Recovery for Wrongful Death, *supra,* 351, § 4:28.

[70] Oregon Laws 1967, ch 544, p 1317. House Bill 1603 was sponsored by Representatives Carson, Frost, Harlan, Packwood, Skelton, Wilson and Senator Lent and, as adopted, made the following changes:

(1) Removed completely the limitation on the amount of recovery (then the sum of $25,000);

(2) Increased the period of limitation on death actions from two to three years (although providing that the period was to run from the "occurrence of the injury causing the death,") and

(3) Added the following provision:

"* * * in every such action such damages may be awarded as, in all the circumstances of the case, may be just, and will reasonably and fairly compensate the spouse, dependents or estate for the actual pecuniary loss, if any, to such spouse, dependents or estate * * *."

jected amendments proposed by W. A. ("Pete") Brooks, representing certain insurance interests, under which a specific and limited measure of damages would have been written into the statute for each of the various types of wrongful death actions.[38]

The legislature did, however, adopt as an amendment to the original bill, immediately following the words "in every such action such damages may be awarded as, in all circumstances of the case, may be just" the additional words "and will reasonably and fairly compensate the spouse, dependents or estate for the actual pecuniary loss, if any, to such spouse, dependents, or estate."[39]

Minutes of the House Judiciary Committee make it clear that in doing so the members of that committee did not intend to change the then-existing law

[38] These proposed amendments would have limited wrongful death actions to cases in which there was a surviving spouse, dependent or parent (except for funeral, medical and hospital expenses incurred by the estate of a decedent). The measures of damages in such cases would have been as follows:

"Section 2. In such action, damages may be awarded as are equal to the total amount of money reduced to present value which the decedent would have probably earned by his intellect or bodily labor in his business or profession during the residue of his life and which, as representing his net savings, would have gone for the benefit of his surviving spouse or dependents, taking into consideration his age, his ability and disposition to work and his habits of living and expenditures.

"(a) For the death of a wife, damages may be awarded as are equal to the present value of her future services to her husband and to her surviving minor children, less the cost of her support and her maintenance.

"(b) For the death of a minor child, damages may be awarded as are equal to the present value of prospective services of said child to his parents from the time of his death until he attained the age of majority, less the cost of his maintenance and education."

[39] This language was apparently taken from the Oregon State Bar Uniform Jury Instructions No. 31.01 and 31.02.

relating to the measure of damages in wrongful death cases, but to recognize the "loss to the beneficiary" and "loss to the estate" rules as then established by decisions of this court. Of particular significance is the fact that the case of *Scott v. Brogan, supra,* was singled out for specific reference as the leading case which stated the existing measure of damages and the factors to be considered by the courts in considering the question of pecuniary loss.[⊕] Of further interest is the fact that the principal reference by the legislative committee to the previous case of *Carlson v. Oregon Short Line Ry. Co., supra,* was that *Scott v. Brogan* appeared to state the established law and to "follow" the *Carlson* case and that the measure of damages "has never really changed."[⊕]

As previously stated, the 1967 Legislature, in adopting HB 1603, declined to "write into the statute" a specific measure of damages for application in either "loss to the beneficiary" cases or in "loss to the estate" cases, either as that stated in *Carlson* or as proposed by Mr. Brooks. This was done despite the fact that by adopting such a specific measure of damages it would have been easy for the legislature to end the criticism of cases such as *Lane v. Hatfield, supra,* by providing, in effect, that in the absence of evidence satisfying such a rule the plaintiff in a wrongful death case was not entitled to have his case submitted to the jury.

---

[⊕] See Minutes of House Judiciary Committee re HB 1603 for March 29, 1967, and April 10, 1967. See also "tapes" of same meetings.

[⊕] See "tape" No. 70, relating to a meeting of House Judiciary Committee on March 29, 1967. See also "tape" No. 74, relating to meeting of April 10, 1967, including statement that the amendment to HB 1603 relating to pecuniary loss did no more than to conform the statute to what the courts had interpreted the previously existing Wrongful Death Statute to mean.

Not only did the legislature decline to do so, but it relied instead upon *Scott v. Brogan* as representing a correct statement of the existing law on this question and the law which the legislature intended to perpetuate, rather than to change. As previously noted, *Scott v. Brogan* was a case in which there was no evidence that decedent would have accumulated any substantial net savings during the remainder of her life expectancy, so as to satisfy the literal requirements of the *Carlson* rule. On the contrary, in *Scott* it was held that the plaintiff was entitled to have the case submitted to the jury to determine the pecuniary loss to the decedent's estate based upon evidence that decedent had an *earning capacity*—a capacity to render useful service of a pecuniary value.

██ It follows, in our opinion, that in adopting HB 1603 the Oregon Legislature intended to continue to leave to the courts the question of defining the circumstances under which recovery will be permitted in wrongful death cases involving "loss to the estate," including the measure of damages to be applied in determining the pecuniary loss to the estate of a decedent in such a case. It also follows, in our opinion, that the legislative intent in the adoption of HB 1603 was to continue the existing practice under which such cases were not to be withdrawn from the jury for lack of evidence that the decedent would probably have accumulated any substantial net savings (as required by literal application of the *Carlson* rule), but under which cases involving claims of loss to the estate of a decedent would continue to be submitted to the jury upon the offer of any substantial evidence of either actual or potential earning capacity, as previously held in *Scott, Skottowe, Rekdahl* and *Lane.* Indeed,

this conclusion is re-enforced and made clear by the adoption in 1967 of the following words of HB 1603:

"\* \* \* in every such action such damages may be awarded as, in all the circumstances of the case, may be just \* \* \*."

Since the adoption of the 1967 amendments three cases have been decided by this court in which reference has been made to the measure of damages in wrongful death cases. In none of these cases, however, did this court undertake to decide the issues presented in this case for decision.[㉒]

---

[㉒] (1) Escobedo v. Ward, 255 Or 85, 464 P2d 698 (1970), was an action under ORS 30.010 for the value of the services of a seven-year-old child, rather than an action under ORS 30.020 for his wrongful death. This court set aside a jury verdict for the plaintiff and remanded the case for a new trial because of an error in instructions under which the jury was not instructed to deduct the expense of the case, support and maintenance of the child. In so holding, reference was made to the 1967 amendments to ORS 30.020 indicating a legislative intent to restrict recovery in wrongful death cases to "the actual pecuniary loss." In *Escobedo* we did not, however, undertake to decide the issue presented in this case, although we recognized (at p 98), that "[u]ntil 1939 the ORS 30.020 cause of action was for the benefit of the decedent's estate only." Thus, we again recognized the significance of our decisions under the original Oregon Wrongful Death Act and prior to 1939, including not only *Carlson* but also *Scott*.

(2) Meier v. Bray, 256 Or 613, 475 P2d 587 (1970), was a wrongful death action for the death of a decedent who left no surviving spouse or dependents, as in this case. This court set aside a jury verdict and remanded the case because the trial court did not instruct the jury that it was necessary for the jury to determine the present value of such amounts as would have been accumulated by decedent as net savings under the rule of the *Carlson* case.

(3) Arrow Trans. v. Northwest Grocery, 258 Or 363, 482 P2d 519 (1971), involved the death of a truck driver who left dependents. In affirming a plaintiff's verdict, the court approved the giving of Orgon Uniform Jury Instruction 31.01 over objection that it did not state a proper test for "pecuniary loss," as required by the 1967 Amendment, saying that:

"Pecuniary loss, \* \* \* has been held to include more than

3. *Plaintiff is entitled to have these two cases submitted to a jury.*

In this case, as in *Scott v. Brogan, Lane v. Hatfield, Rekdahl v. Chency* and *Skottowe v. O.S.L. etc Ry. Co.,* there was no evidence that decedents would ever have accumulated any substantial net savings during the remainder of their life expectancy. There was, however, far stronger evidence than in those cases that these decedents had an actual earning capacity, as well as a capacity to render useful service of a pecuniary value. Thus, it appears that Sister O'Donnell not only had a Master of Education degree as the result of college graduate studies, but was at the time of her death qualified to earn $13,725 per year in the Portland public school system as the principal of an elementary school. Similarly, Sister Zucca was a trained school librarian and was qualified to earn $10,125 in the Portland public school system.

■ Because of this evidence it follows, in our opinion, that plaintiff was entitled to bring these actions for wrongful death and to have them submitted to a jury to determine and award "such damages * * * as, in all the circumstances of the case, may be just, and will reasonably and fairly compensate [their * * * estates] for the actual pecuniary loss, if any, to such * * * estate[s]."<sup>⊕</sup> Conversely, it follows, in our opinion, that the trial court erred in holding, as a mat-

---

'the amount of monetary benefit which would accrue through the earning capacity and thriftiness of the deceased * * *.' " We also quoted other previous decisions to the same effect and held that *Escobedo v. Ward* was "not to the contrary."

⊕ It was stipulated that no funeral, medical or hospital expenses were incurred by either estate as the basis for further recovery.

ter of law, that "plaintiff * * *, as the executrix of the estates of said decedents would not be entitled to recover damages in an action brought against the defendants for the alleged wrongful death of the decedents based upon a benefit of the estate rule * * *."

Such a result must follow, in our opinion, even though in such cases the defendants may be entitled to instructions to the jury based upon the rule of the *Carlson* case. This is so because, as in *Scott, Lane, Rekdahl* and *Skottowe,* and also as recognized in *Carlson, supra* at 457, "[t]here is an inherent difficulty in placing a pecuniary value upon human life" and the amount of recovery "must depend very much on the good sense and sound judgment of the jury, upon all the facts and circumstances of each particular case," recognizing that in all such cases there must be some "degree of speculation and uncertainty."

Such a result must also follow, in our opinion, even though the defendants may be entitled to offer evidence of the vow of poverty taken by both decedents. In our view, however, such evidence would not preclude recovery, as a matter of law, any more than the evidence as offered in these other cases.[40]

---

[40] Thus, in Scott v. Brogan, *supra,* there was evidence that decedent was on welfare and had six dependent children to care for and there was no evidence that she would probably accumulate any net savings.

In Lane v. Hatfield, *supra,* and Rekdahl v. Cheney, *supra,* involving young children, there was no evidence, other than their potential earning capacity, that they would ever accumulate any substantial net savings and it was clear that the expense of their support and maintenance would exceed any expected contribution to their parents.

In Skottowe v. O.S.L. etc Ry. Co., *supra,* it was conceded that decedent, an elderly man living on his income, would never accumulate any additional net savings during the remainder of his life expectancy.

In other words, plaintiff was at least entitled to have these two cases submitted to a jury.[45]

It is our further opinion, however, that the time has now come to face up to the difficulty in reconciling a strict and literal application of the *Carlson* rule with the practical effect of the decisions of this court not only in *Scott v. Brogan,* but also in *Skottowe, Rekdahl* and *Lane,* as well as the difficulty in reconciling a strict application of *Carlson* with the public policy, as recognized by the legislature, of making a fair award "in every such action" to compensate for the "actual pecuniary loss, if any," suffered by the estate, to the same extent as approved by this court in *Scott v. Brogan.* Indeed, this is the first case since *Scott v. Brogan,* in which these problems have been squarely presented.

The statutory requirement that there must be an "actual pecuniary loss" to the *estate* of the decedent, when combined with a strict application of the *Carlson* rule requiring proof of the anticipated accumulation of net savings on death, may lead to most incongruous results. Thus, upon the death of a thrifty, but mean and miserly man who has no spouse or dependents, and who had never contributed anything to any charity or to the support or assistance of any needy relative or other person, a distant relative or a wholly unrelated beneficiary may reap a rich reward in an action for wrongful death. Yet upon the death of an even harder working person, also without spouse or statutory dependents, who earns more money but has contributed all of his net savings each year to the support of relatives who are not statutory dependents

---

[45] See also Speiser, Recovery for Wrongful Death, *supra,* 259, § 3:59, and Annot., 69 ALR2d 628. Cf. Gabrielson v. Dixon, 133 Or 567, 291 P 494 (1930).

or to the assistance of other needy persons or charities, no one could recover any substantial damages.

Thus, while we say that the purpose of an action for wrongful death is to place a pecuniary value upon the life lost (*Carlson v. Oregon Short Line Ry. Co., supra* at 457 and 459), the result in these two hypothetical cases would be to give no value to the life of the person whose life had the greatest pecuniary value in terms of actual or potential earning capacity. Indeed, it has been said that this illustrates the problem which may "call loudest for redress."[⑩]

In *Carlson, supra* at 457, this court quoted, with seeming approval, from the decision by Judge DEADY in *Holmes* to the effect that it is the " '*capacity* for rendering useful services to others, *or* acquiring property' " that must be considered. In *Carlson,* the court also recognized (at p 459) that the ultimate issue in wrongful death cases is the "value of the life lost." In that case, however, and in most of the cases citing the rule of *Carlson,* it was not necessary to decide the question whether the capacity to earn or to render

---

[⑩] Cf. 2 Harper and James, The Law of Torts 1333, § 25.15. Although also not directly in point, see Carter v. North Carolina R. Co., 139 NC 499, 52 SE 642, 643-4 (1905), as follows:

"But a small number of men accumulate estates. Their income or earning, after paying their actual personal expenses, are expended in the support and education of their children. Certainly it was not contemplated that for wrongfully causing the death of such a man no damage could be recovered, although his death deprived his family of their sole support, while for the death of one without any family, or who by miserly living and hoarding deprives his family of support and education, large damages should be awarded. It cannot, with any show of truth, be said that in the first case the family sustain no pecuniary loss by reason of the death of the husband and father. Such a construction of the statute would place beyond the protection of the law nine-tenths of the people."

useful and valuable services to others would of itself provide a separate and independent basis for recovery. This is because most of those cases involved persons who had been engaged in performing services for payment in money.

In *Scott,* and to a lesser degree in *Lane, Rekdahl* and *Skottowe,* the issue might have been discussed and decided, but was not squarely presented, although it was held that the plaintiffs in those cases were entitled to have them submitted to a jury and the effect of the decision in those cases was to hold that evidence of actual or potential earning capacity was sufficient to establish a prima facie case for consideration by the jury. In so holding, however, this court did not decide whether application of the *Carlson* rule would prohibit the submission of such a case to a jury. Neither has this court ever had occasion to decide whether the rule of *Carlson* for determination of pecuniary loss to the estate of a person who has been employed for monetary compensation has any proper application in a case involving the pecuniary loss to the estate of a person who has been performing services of a pecuniary value, but without monetary compensation. "Pecuniary loss," of course, does not require loss of money or specie, as such.[⑳]

Upon research of cases decided by the courts of other jurisdictions we find a dearth of authority on these questions. However, in *Stang v. Hertz Corporation,* 81 NM 69, 463 P2d 45 (Ct App 1969), *aff'd* 81 NM 348, 467 P2d 14 (1970), the court authorized recovery under quite similar facts. That case also involved the death in an automobile accident of a nun

---

[⑳] Cf. Arrow Trans. v. Northwest Grocery, *supra,* 211-12, and Comment, Wrongful Death Damages in North Carolina, 44 NC L Rev 402, 418 (1966).

who had taken a vow of poverty and left a will naming Sisters of Charity as the sole beneficiary. At the time of her death she was the director of a church school and it was stipulated, as in this case, that she was qualified for employment in the public school system at a substantial salary. The provisions of the New Mexico statute were quite similar to the provisions of the original Oregon Wrongful Death Act.[58] The New Mexico statute, however, had been interpreted as a survival statute,[59] while the Oregon Wrongful Death Act has been held to be not a survival statute.[60] Despite that difference, it is significant that the New Mexico Supreme Court held that recovery should be allowed in that case and stated that:

> "The statutes allowing damages for wrongful act or neglect causing death have for their purpose more than compensation. It is intended by them, also, to promote safety of life and limb by making negligence that causes death costly to the wrongdoer." (Citations omitted) 467 P2d at 16-17.

While we may not entirely agree with that statement, we do agree that there is a basic unfairness

---

[58] The relevant portions of § 22-20-1 of the New Mexico statute were as follows:

"Whenever the death of a person shall be caused by the wrongful act, neglect or default of another, although such death shall have been caused under such circumstances as amount in law to a felony, and the act, or neglect, or default, is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who or the corporation which, would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured."

See note 15 for provisions of original Oregon Statute.

[59] See 467 P2d at 18.

[60] See Perham v. Portland Electric Co., 33 Or 451, 459-464, 53 P 14 (1898), among other cases.

in permitting a defendant who has negligently killed a person who has a substantial earning capacity and capacity to render valuable services to others, and who has been rendering such services for another person by agreement, but without compensation, to escape all liability, despite the obvious loss to the other person, upon the ground that the estate of the decedent has suffered no loss because there would have been no accumulated net savings. In such a case the life of the person killed obviously has substantial pecuniary value in terms of earning capacity, and a substantial pecuniary loss will also be suffered by the loss of the services of such a person to the other person.

In this case, however, it is not necessary for us to decide the ultimate question whether the measure of damages in all such cases should be the actual or potential earning capacity of the decedent or his capacity to render useful services having a pecuniary value.

■ This case does, however, present for decision the more limited question whether there is a proper legal basis under ORS 30.020 for an award by a jury of damages in any substantial amount for the death of a person who has a substantial earning capacity or capacity for useful service with a pecuniary value if that person leaves no spouse or dependents, but has been performing such services by agreement, but without compensation, *for the same person who is the sole beneficiary of decedent's estate and who has suffered a substantial pecuniary loss upon the death of such a decedent because of the termination of such services.*

Such a case can arise not only where the decedents are nuns who work without pay for religious orders, but whenever a person who has no spouse or

dependents has the capacity to earn money, but devotes substantially all of his or her time to rendering of services without compensation to other persons who are also the sole beneficiaries of the estate of the decedents, and who will suffer substantial loss, not from the loss of any bequest by will, but from the deprivation of such services. This may, for example, include services performed by agreement, but without compensation, for an aged or invalid grandparent or other person, as well as for a charitable organization.

We do not believe that the Oregon Legislature, if presented with this problem, would have intended that the 1967 Amendments to the Oregon Wrongful Death Act would foreclose recovery in such a case.[59] Indeed, it is significant that the 1967 Oregon Legislature refused to adopt a fixed and unflexible measure of damages for application in all cases. We are inclined to the belief that by doing so, and by leaving the development of the law on this subject to the court, the legislature intended that the courts be left free to develop further rules under which "in every such action such damages may be awarded as, in all the circumstances of the case, may be just,"[60] as in *Scott, Lane, Rekdahl* and *Skottowe,* subject only to the limitation that there must be pecuniary loss or damage.

■ For all of these reasons, we hold that the rule of *Carlson* under which, if literally applied, there must be proof of the probable accumulation of net savings,

---

[59] As stated in Hoyt v. United States, 286 F2d 356, 362 (5th Cir 1961):

"* * * [W]e cannot believe that Congress intended to allow any such cold-blooded deduction. Such a deduction is not actually logical for it would treat an incalculable *loss* as a 'pecuniary gain.' "

[60] ORS 30.020; Oregon Laws 1967, ch 544, p 1317.

while proper for application to the facts of that case, has no proper application to the facts of this case, in which the decedents were not employed for money, but had demonstrated capacities to earn money and to perform useful services of a pecuniary value and had been performing such services by agreement, without compensation, for the same charitable organization which was also the sole beneficiary of decedents' estates. On the contrary, we hold that in such cases the proper test to be applied is the pecuniary value of the life of the decedent in terms of the pecuniary value of the services performed by him, without compensation, for the person or charitable organization who is the sole beneficiary under his will and who will suffer a corresponding pecuniary loss as a result of being deprived of such continued services.

More specifically, we hold that in this case the proper measure of damages is the difference between the present value of the income which the decedents had the capacity to earn during the remainder of their life expectancies and the present value of the cost to Sisters for decedents' food, room and other living expenses during the same period. In the absence of evidence to the contrary, this is substantially the same amount that would presumably have been payable to Sisters as the sole beneficiary of decedents' estates if they had been paid for the reasonable value of their services in money and, in turn, had paid in money for such living expenses and had saved the excess during the remainder of their lives, so as to constitute the amount of the accumulated net savings which would then have been payable to Sisters under the terms of their wills, less the expenses of the administration of such estates.

It may be said that, as a result, we are ap-

plying the "loss to the beneficiary" rule, in which the value of lost services may be considered, to a case in which the required measure of damages is the "loss to the estate" of the decedent. In this case, however, the person or charitable institution for whom the services were performed by agreement, but without compensation is also the sole beneficiary of the estate. We have long recognized that although the right of action in a wrongful death case is given to the personal representative of a decedent's estate, yet the fact remains that for all substantial purposes he represents collectively all who are interested in the continuance of decedent's life, including the distributees under decedent's will, where there is no spouse or "dependents."[9] Despite amendments to the original Oregon Wrongful Death Act, we still believe that this is true, at least as a practical matter.

■ For these reasons, we believe that under these particular facts the "loss to the beneficiary" is, for all practical purposes, the "loss to the estate" of which Sisters is the sole beneficiary. In other words, we hold that the plaintiffs are entitled to have their case submitted to the jury because the Sisters are the sole beneficiary of the estates of the decedents and the defendants could be found to have wrongfully deprived

---

[9] Thus, as stated in Putman v. Southern Pacific Co., 21 Or 230, 27 P 1033 (1891), at p 234:

"While, then, it is true that the right of action is given to the administrator as the legal representative of the estate, and he sues for its benefit, and the damages recovered become a part of its assets, yet the fact remains that for all substantial purposes the administrator, in the prosecution of that action and the distribution of its proceeds, represents collectively all who were interested in the continuance of that life, whether as creditors, or as wife, or as distributees."

To the same effect, see Carlson v. Oregon Short Line Ry. Co., *supra*, at 459.

the Sisters of the services of the decedents to the pecuniary loss of the Sisters.

We believe that this result is in accord with the present trend to liberalize the rule of "pecuniary loss" in wrongful death cases and to respond to "new emergencies" in this often perplexed and tortured field of the law.[48] As once stated by Justice Cardozo:

"* * * It would be a misfortune if a narrow or grudging process of construction were to exemplify and perpetuate the very evils to be remedied."[49]

For all of these reasons, we reverse the judgment of the trial court.[50]

---

[48] Prosser on Torts, *supra,* 907-908, § 127; Voss, Recovery of Damages for Wrongful Death at Common Law, at Civil Law, and in Louisiana, 6 Tul L Rev 201, 242-43 (1932); Johnson, Wrongful Death and Intellectual Dishonesty, 16 S Dak L Rev 36, 44 (1971); and Comment, A Modern View of Wrongful Death Recoveries: Herein of the Infant and the Aged, 54 Nw U L Rev 254 (1959). This result is also consistent with the "functional view of damages" as advocated by 2 Harper & James, The Law of Torts, *supra,* 1331-2, § 25.14.

[49] Van Beeck v. Sabine Towing Co., 300 US 342, 350, 57 S Ct 452, 81 L ed 685 (1937). To the same general effect, see Cowgill, Adm'r v. Boock, Adm'r, 189 Or 282, 295, 218 P2d 445 (1950).

[50] In view of the basis for our decision in this case it is not necessary to consider or decide the constitutional issues raised by appellant.