Argued and submitted June 4, affirmed in part; reversed in part;
and remanded October 23, rehearing denied November 13, 1979

CHRISTENSEN,
*Petitioner-Appellant,*
*v.*
EPLEY, et al,
*Respondents,*
MURPHY, et al,
*Petitioners-Respondents,*

(TC 14561, CA 9092, SC 25898/25909)

601 P2d 1216

W. Eugene Hallman, Pendleton, argued the cause for petitioner/appellant. With him on the brief was Robert T. Mautz and Mautz and Hallman, Pendleton.

I. Franklin Hunsaker, Portland, argued the cause for petitioners/respondents. With him on the brief were R.R. Bullivant, Douglass M. Hamilton, Bullivant, Wright, Leedy, Johnson, Pendergrass & Hoffman, Portland, and Corey, Byler & Rew, Pendleton.

Before Denecke, Chief Justice, and Holman, Tongue, Howell, Linde and Peterson, Justices.

TONGUE, J.

Separate opinions by TONGUE, J., PETERSON, J., and HOLMAN, J.

**TONGUE, J.**

This is an action for wrongful death. It was filed by the personal representative of the estate of a police officer who was fatally stabbed by one Daryl Thompson in the course of Thompson's efforts to assist in the escape of a female inmate from a juvenile detention center in Pendleton.

Named as defendants in addition to Daryl Thompson were Sherrie Murphy, the matron on duty at the center on the night of the escape and an employee of Umatilla County, who allegedly permitted Thompson to enter it and visit the inmate; James Epley and Tim Waller, also county employees, who allegedly assigned Murphy to work alone as the matron on the night of the escape, and Umatilla County.

The complaint was filed on behalf of decedent's surviving widow, his five minor children, and his mother. The complaint alleged and prayed for damages in the sum of $300,000 against defendants Murphy, Waller, Epley and Umatilla County. The trial court, on motion by these defendants, struck the allegation of damages in that amount on the ground that it exceeded the statutory limit under the Oregon Tort Claims Act of $100,000, as provided by ORS 30.270(1)(b). The trial court also sustained defendants' demurrer to plaintiff's complaint.[1]

The Court of Appeals, on appeal by plaintiff from the resulting judgment dismissing her complaint with prejudice, held that the trial court erred in sustaining defendants' demurrer, but also held that the trial court properly limited plaintiff's prayer for relief to $100,000. 36 Or App 535, 585 P2d 416 (1978). Both

---

[1] These motions and demurrers were filed on behalf of defendants Murphy, Epley, Waller and Umatilla County, who are referred to in this opinion as "defendants." Defendant Thompson is not involved in this appeal.

parties filed petitions for review to this court.[2] Defendants' petition for review asks this court to reverse the holding by the Court of Appeals that the trial court erred in sustaining defendants' demurrer to plaintiff's complaint and that plaintiff is entitled to a trial under the allegations of her complaint. Plaintiff's petition for review asks this court to reverse the holding by the Court of Appeals that the trial court properly limited plaintiff's prayer for relief to $100,000.

This court is equally divided on the question whether the Court of Appeals was correct in its holding that the trial court erred in sustaining defendants' demurrer to plaintiff's complaint. Chief Justice Denecke, Justice Holman and Justice Peterson are of the opinion that the trial court did not err. Justice Tongue, Justice Howell and Justice Linde are of the contrary opinion. Justice Lent disqualified himself from participation in this case.

Because the court is equally divided upon this question a majority of the court is of the view that it would serve no useful purpose for the court, as a court, to issue any opinion on this question. It follows, however, that the decision by the Court of Appeals must be affirmed on this question, with the result that plaintiff is entitled to a trial under the allegations of her complaint.

This court is unanimous, however, in its holding that the Court of Appeals erred in its holding that the trial court properly limited plaintiff's prayer for relief to $100,000.

As previously stated, both the trial court and the Court of Appeals held that plaintiff's potential recovery of damages against Umatilla County and its

---

[2] The Court of Appeals also held that the trial court properly sustained the demurrer of defendants Epley and Waller that plaintiff's complaint failed to state a cause of action under the Oregon Tort Claims Act against those defendants for the reason that their alleged conduct fell within the exception provided by ORS 30.265(3)(c) for discretionary acts. Neither petition for review contends that the Court of Appeals was wrong in so holding.

employees, defendants Epley, Waller and Murphy, was limited to $100,000 by reason of provisions of the Oregon Tort Claims Act, ORS 30.270(1)(b).

ORS 30.270(1) provides:

"(1) Liability of any public body or its officers, employes or agents acting within the scope of their employment or duties on claims within the scope of ORS 30.260 to 30.300 shall not exceed:

"(a) $50,000 to any claimant for any number of claims for damage to or destruction of property, including consequential damages, arising out of a single accident or occurrence.

"(b) $100,000 to any claimant for all other claims arising out of a single accident or occurrence.

"(c) $300,000 for any number of claims arising out of a single accident or occurrence."

Defendants contend that the trial court and Court of Appeals were correct in so holding for the following reasons:

"The history and language of the Oregon Wrongful Death Act, ORS 30.010 *et seq.,* and the cases decided thereunder show that a cause of action for wrongful death constitutes but *one claim* to be pursued by *one claimant,* the personal representative, regardless of how many persons are aggrieved by the wrongful death. The number of dependents and family relationships broaden the wrongful death measure of damages *generally.* But in wrongful death actions commenced under the Tort Claims Act, the number of beneficiaries simply defines the measure and apportionment of damages *within the confines of the $100,000 limit governing the claim under ORS 30.270(1)(b).* Therefore, the aggregate exposure of Defendants in this matter is $100,000, and the trial court was correct in so ruling."

A. *The Oregon Wrongful Death Act.*

The original Oregon Wrongful Death Act was enacted in 1862. *See* Deady, General Laws of Oregon 1845-1864, p. 241, § 367. The recovery under that first

[543]

statute was for the benefit of the decedent's estate and the measure of damages, as held by this court in *Carlson v. Oregon Short Line Ry. Co.,* 21 Or 450, 457-58, 28 P 497 (1892), was:

> "* * * the pecuniary loss suffered by the estate, without any *solatium* for the grief and anguish of surviving relatives or pain and suffering of the deceased; and that loss is what the deceased would have probably earned by his intellectual or bodily labor in his business or profession during the residue of his life, and which, as representing his net savings, would have gone for the benefit of his estate * * *."

In *Carlson,* however, this court (at 458-459) expressly distinguished between the Oregon statute and statutes as elsewhere adopted "modeled upon" the original Lord Campbell's Act, under which "the right of action is not given to the personal representative for the benefit of the estate, but for the benefit of certain persons named therein, and the personal representative is a mere nominal party, who sues for their benefit," saying:

> "* * * Not so under our statute, where the object is to recover the loss sustained by the estate, and not to recover the pecuniary loss sustained by any particular individual or individuals.
>
> "By force of [Hill's Code] section 371 [Deady Code § 367], the personal representative, in the prosecution of the action and the distribution of the proceeds, represents collectively all who are interested in the continuance of the life, whether as creditors, heirs, or distributees. * * *"

and that:

> "* * * The difference in the two classes of cases is between the damage done to the estate and the damage done to the designated persons. That to the estate is measured, as nearly as can be, by the value of the life lost, and that to the beneficiaries by the value of the life lost to them. * * *"

We might well agree with defendant that under the original Oregon Wrongful Death Act there was but "one claim to be pursued by one claimant," so as to

limit recovery under the Oregon Tort Claims Act to $100,000 by reason of the provisions of ORS 30.270(1)(b). We do not agree, however, with defendants' contention that the "basic character of the action remained unchanged" despite subsequent amendments to the Oregon Wrongful Death Act, or with defendants' contention that the effect of those amendments was only to "expand" the "measure and allocation of recoverable wrongful death damages."

On the contrary, we believe that the effect of amendments to the Oregon Wrongful Death Act, particularly those adopted in 1973, has been to so change its basic provisions as to make the Oregon Act more similar to wrongful death acts of the type described in *Carlson* under which the right of action in a case such as this is not primarily for the benefit of the estate, but for the benefit of the spouse and children of the decedent as the "real parties in interest," with the personal representative as "a mere nominal party," who sues for their benefit for the recovery of "the value of the life lost to them."

Under the present Oregon Wrongful Death Act, after amendments in 1939 and 1967,[3] and more particularly in 1973,[4] recovery is now expressly provided for the benefit of the spouse, children and parents of the decedent, not only for *their* pecuniary loss, but also for their loss of decedent's society, companionship and services, as well as for recovery to the estate of medical and funeral expenses, among other things.[5]

---

[3] For a review of the history of the Oregon Wrongful Death Act prior to 1973, including amendments in 1939 and 1967, *see Goheen v. General Motors Corp.,* 263 Or 145, 502 P2d 223 (1972).

[4] Or L 1973 ch 718. *See* Comment, "Wrongful Death Actions in Oregon: New Developments," 10 Will. L.J. 217 (1974).

[5] ORS 30.020 presently provides as follows:

"(1) When the death of a person is caused by the wrongful act or omission of another, the personal representative of the decedent, for the benefit of the decedent's surviving spouse, surviving children, surviving parents and other individuals, if any, who under the law of

Thus, as a result of these amendments, the present statute provides, in effect, for an action to be brought in the name of the personal representative of the estate to enforce the individual claims of the spouse and of each child for the pecuniary loss to each of them as a result of the death of the decedent and for the loss to each of them of the decedent's society, companionship and services.

This is consistent with the view as stated in 2 Speiser, Recovery for Wrongful Death 2d, 238-40, § 11:34 (1975) that:

> "A personal representative proceeding under wrongful death statutes requiring him to bring the action for the benefit of certain designated beneficiaries is a mere nominal party having no interest in the case for himself or the estate he represents. He does not act in his general capacity as executor or administrator or as representative of the decedent's estate. Instead, he sues as trustee on behalf of the particular persons designated in the act, even though the action is brought in his name as executor or administrator. In other words, the persons designated in the statute are the real parties in interest."

intestate succession of the state of the decedent's domicile would be entitled to inherit the personal property of the decedent, may maintain an action against the wrongdoer * * *.

"(2) In an action under this section damages may be awarded in an amount which:

· "(a) Includes reasonable charges necessarily incurred for doctors' services, hospital services, nursing services, other medical services, burial services and memorial services rendered for the decedent;

"(b) Would justly, fairly and reasonably have compensated the decedent for disability, pain, suffering and loss of income during the period between injury to the decedent and the decedent's death;

"(c) Justly, fairly and reasonably compensates for pecuniary loss to the decedent's estate;

"(d) Justly, fairly and reasonably compensates the decedent's spouse, children and parents for pecuniary loss and for loss of the society, companionship and services of the decedent * * *."

■ It follows, in our opinion, that we must reject defendants' contention that under the provisions of the Oregon Wrongful Death Act, there is in a case such as this, in which decedent left a widow and five children, "but one claim to be pursued by one claimant."[6]

B. *The Oregon Tort Claims Act.*

■ As previously stated, the question to be decided is whether an action for wrongful death of a decedent leaving a widow and five children is subject to the $100,000 limitation imposed by ORS 30.270(1)(b) of the Oregon Tort Claims Act upon liability of public bodies or their officers, employees or agents "to any claimant for all other claims arising out of a single accident or occurrence," or whether such an action is subject to the $300,000 limitation imposed by ORS 30.270(1)(c) upon liability "for any number of claims arising out of a single accident or occurrence."

The terms "claimant" and "claims," as used in ORS 30.270, may be said to be ambiguous in the legal sense as applied to actions for wrongful death. In an attempt to discover the intent of the legislature in the use of these terms in this context, we have examined the legislative history of ORS 30.270 but have not discovered anything of any substantial assistance. We must therefore seek a solution to this problem by analysis of the terms of the Oregon Tort Claims Act,

---

[6] In support of that contention defendants also refer to ORS 30.070 of the Oregon Wrongful Death Act, which provides that:

"The personal representative of the decedent, with the approval of the court of appointment, shall have full power to compromise and settle any claim of the class described in ORS 30.030, whether the claim is reduced to judgment or not, and to execute such releases and other instruments as may be necessary to satisfy and discharge the claim. * * *"

and to ORS 30.030(1) which provides that:

"Upon settlement of a claim, or recovery of judgment in an action, for damages for wrongful death, by the personal representative of a decedent under ORS 30.020, the amount of damages so accepted or recovered shall be distributed in the manner prescribed in this section."

We do not believe these provisions to be inconsistent with the proposition that the widow and each child of a decedent have separate "claims."

including ORS 30.270, when read together with the terms of the Oregon Wrongful Death Act.

As previously stated, in actions for wrongful death involving a widow and minor children, they are the real parties in interest insofar as their claims under ORS 30.020(2)(d) for "pecuniary loss" and loss of services are concerned. It follows, in our judgment, that in such a case the personal representative of the estate, in prosecuting such claims under the Oregon Tort Claims Act in an action for wrongful death under the present Oregon Wrongful Death Act, acts only as a nominal party and is not a single "claimant" within the meaning of ORS 30.270(1)(b), so as to be subject to the limitation of $100,000 imposed by that subsection. Similarly, it follows, in our judgment, that in such a case there is more than one "claim" and more than one "claimant" within the meaning of ORS 30.270(1)(c), so as to be subject to the limitation of $300,000 as provided by that subsection.[7]

For these reasons, the decision by the Court of Appeals reversing the trial court for sustaining defendants' demurrer to plaintiff's complaint must be affirmed because this court is equally divided on that question, but both the Court of Appeals and the trial court must be reversed for holding that the claims

---

[7] This result is also consistent, in our judgment, with the provisions of ORS 30.275(2) of the Oregon Tort Claims, relating to notices of claims under the Act and which includes the following provision:

"When the claim is for death, the notice may be presented by the personal representative, *surviving spouse or next of kin* * * *." (Emphasis added)

Such a result is also consistent with the provisions of ORS 30.275(1), as amended in 1977 (Or L 1977 ch 823, § 3), which provide that notices of claims under the Oregon Tort Claims Act shall state "the name of the claimant *and* his representative or attorney, if any." (Emphasis added)

Thus, even though actions under the Oregon Wrongful Death Act must be filed in the name of the personal representative of the estate of the decedent for the benefit of his widow and children, it appears to be recognized by these provisions of the Oregon Tort Claims Act that when a claim under that Act is "for death," the "spouse" and "next of kin" of a decedent are "claimants"for the purpose of giving notice of such claims.

[548]

presented in this action for wrongful death, including claims for the benefit of decedent's widow and five children, are subject to the $100,000 limitation imposed by ORS 30.270(1)(b).

Affirmed in part, reversed in part, and remanded.

**TONGUE, J.,** concurring.

Because this court is equally divided upon the question whether the Court of Appeals should be affirmed or reversed in its holding that the trial court erred in sustaining defendants' demurrer to plaintiff's complaint, the majority of the court is of the view that no useful purpose would be served for this court, as a court, to issue any opinion on this question.

Because of the nature and importance of this question, however, my brothers Peterson and Holman and I are of the opinion that the publication of our respective and opposing views on this question may well serve some useful purpose for the benefit of the trial bench and bar of Oregon. In my opinion, the Court of Appeals was correct in that holding for the following reasons:

A. *The allegations of plaintiff's complaint.*

Plaintiff's complaint alleged that defendant Murphy was the matron at the detention center and, as such, was "responsible for the maintenance of security and safety within the center" and that the decedent was a Pendleton police officer. The complaint then alleged as follows:

VII

"In the late hours of February 5, 1976, defendant Sherrie Murphy, while working as the sole juvenile officer present, permitted *and assisted* defendant Daryl Thompson in entering the facilities of the Northeast Oregon Regional Youth Center. Within a short time after his entrance, defendant Daryl Thompson assisted a female juvenile inmate, Jeanne Noble, to escape and both fled from the detention center."

## VIII

"Defendant Daryl Thompson, immediately after escaping from the Northeast Oregon Regional Youth Center and while still attempting to flee from the scene with escaped inmate Noble, intentionally and feloniously attacked John Paul Christensen with a hunting knife, stabbing him in the chest and leg and causing injuries which resulted in his death on February 7, 1976."

## IX

"The death of John Paul Christensen was proximately caused by the negligence of Sherrie Murphy in one or more of the following particulars:

(1) *"In allowing defendant* Daryl Thompson *to enter* the Northeast Oregon Regional Youth Center after visiting hours in disregard of the rules of the Northeast Oregon Regional Youth Center.

(2) "In failing to alert police officers that an unauthorized person was in the Northeast Oregon Regional Youth Center.

(3) "In failing to properly supervise the activities and conduct of defendant Daryl Thompson and the female juvenile while in the Northeast Oregon Regional Youth Center.

(4) "In allowing defendant Daryl Thompson and the female juvenile to escape from the Northeast Oregon Regional Youth Center.

(5) "In failing to alert police officers to the whereabouts of defendant Daryl Thompson although she was aware that defendant Daryl Thompson had run away from home in violation of a prior juvenile court order."

In a second count the complaint realleged these same facts and also alleged that:

## II

"At the time defendant Murphy *permitted and assisted* defendant Thompson in entering the center, she was aware of the fact that defendant Thompson had just run away from home in violation of a prior Umatilla County Juvenile Court order."

[550]

## III

"At the time defendant Sherrie Murphy *permitted and assisted* defendant Daryl Thompson in entering the facilities of the Northeast Oregon Regional Youth Center, *defendant Murphy was aware,* or in the exercise of reasonable care should have been aware, *that defendant Thompson and the juvenile inmate Noble had a close personal relationship and had previously stolen an automobile together and fled the county."* (Emphasis added)

### B. *Defendants' contentions.*

In support of the petition for review by defendants Murphy and Umatilla County, it is contended that:

(1) "Plaintiff's complaint did not state facts from which a 'legal duty' could be implied in that plaintiff failed to allege any special relationship between Defendants and either the third party juvenile who inflicted the fatal wounds or the Plaintiff's decedent.

(2) "The fatal wounds intentionally inflicted upon Plaintiff's decedent by the third party juvenile were not foreseeable by the Defendants in that they occurred through the 'concatenation of highly unusual circumstances.'

(3) "The intentional criminal act of the third party juvenile constituted a superseding cause which broke the chain of any possible legal causation and relieved the Defendants from any potential liability."

Because this case comes before this court on demurrer, rather than on motion for non-suit, directed verdict, or judgment n.o.v., it is important at the outset to bear in mind that in considering these contentions and in deciding whether the trial court erred in sustaining defendants' demurrer we must not only assume the truth of these allegations, but also the truth of any evidence which it is "reasonably conceivable" that the plaintiff could have offered under these allegations. *Mezyk v. National Repossessions,* 241 Or 333, 338-39, 405 P2d 840 (1965).

■ *Defendants' "special relationship" contention.*

In the Court of Appeals defendants contended that plaintiff's complaint was vulnerable to demurrer because it failed to allege such a "special relationship." To the same effect, it is urged by Peterson, J., in his opinion that there must be a "custodial relationship" and that "[a]bsent this relationship, no duty exists to control the conduct of the criminal actor." In our opinion, there are three answers to this contention.

(a) *If required, a "special relationship" was sufficiently alleged.*

First of all, and assuming that such a "special relationship" must be alleged and proved by the plaintiff in this case (an assumption with which I disagree, for reasons to be stated), I believe that such a "special relationship" was sufficiently alleged in this case. I do not read Restatement of Torts (Second) § 315, as quoted by Peterson, J., to require a "custodial relationship" between the jailer and the person who killed plaintiff's decedent of such a nature as to satisfy Restatement § 319. That section, as quoted by Justice Peterson, does not purport to state the *only* kind of "special relationship" intended by § 315. Instead, § 315 speaks of a "special relationship" and the requirements of that section can be satisfied *either* by some "special relationship" between the defendant and the third person or between the defendant and the injured person.

Surely defendants and Justice Peterson would not contend that if John Dillinger, the famous gangster, came at night to a jail where his "girl friend" was being held, a jailer would have no duty to exercise reasonable care to see that he did not then try to help her to escape from jail because there was no "custodial relationship" between the jailer and Dillinger.

In my view, once a jailer allows a visitor to enter a jail, a "special relationship" arises within the meaning of § 315 between the jailer and the visitor of such a nature as to impose upon the jailer a duty to control

the visitor's conduct so as, for example, to prevent the visitor from smuggling weapons to an inmate in the jail or, as in this case, to assist an inmate to escape from the jail.

In addition, I believe, as held by the Court of Appeals, that a jailer, by undertaking the custody of a prisoner, undertakes a duty to prevent his escape and that, as a result, a "special relationship" arises within the meaning of § 315 between the jailer and a police officer who may be called upon to prevent such an escape or to apprehend the escaping prisoner.

(b) *No "special relationship" was required in this case.*

In my judgment, however, no "special relationship" was required in this case. The defendants and the opinion by Justice Peterson view the duty of the defendant as arising out of a "special relationship" between the state and Jeanne Noble, an inmate. Such an analysis might be necessary were we seeking to impose liability upon the state for the *failure* of its agents to retain control over Jeanne Noble. In this case, however, the essence of at least some of plaintiff's allegations of negligence is not so much that the matron *failed* to do acts necessary for the protection of the police officer as it is that the matron engaged in *affirmative conduct* which created an unreasonable risk to others in that she "permitted *and assisted*" Thompson to enter the detention center at night after visiting hours with actual or constructive knowledge that he and the inmate had a close personal relationship, that Thompson had just run away from home in violation of a juvenile court order, and that Thompson and the inmate "had previously stolen an automobile together and fled the county."

As stated in Restatement of Torts 2d, § 284 (1965):
"Negligent conduct may be either:
"(a) *an act* which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another, or

"(b)  *a failure to do an act* which is necessary for the protection or assistance of another and which the actor is under a duty to do." (Emphasis added)

As also stated in Restatement, *supra,* § 302B:

"*An act or an omission* may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." (Emphasis added)

Comment (e) under § 302B states that:

"There are, however, situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a *special responsibility* toward the one who suffers the harm, which includes the duty to protect him against such intentional conduct; *OR where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk* of harm through such misconduct, which a reasonable man would take into account. * * *" (Emphasis added)

To the same effect, *see* Restatement, *supra,* § 449, comment (a).

Indeed, the opinion by Justice Peterson quotes with approval comment (e) under § 302B which clearly distinguishes between the duty of one under a "special responsibility" (or "relationship") toward one who suffers harm to protect such a person and the duty of one whose "own affirmative act" has exposed another person to a "high degree of risk of harm," as in this case and as subsequently discussed.[1]

As also stated in 2 Harper and James, The Law of Torts, 1044, § 18.6 (1956):

---

[1] Also, the duty arising from the "special relationship" described in Restatement § 315, also quoted by Justice Peterson, is one which imposes a duty "to prevent" a third person from causing harm to another (*i.e.,* a duty to take affirmative action to prevent harm to a person who might suffer harm if no such affirmative action is taken), as distinct from situations, as in this case, in which a defendant has *previously* engaged in affirmative conduct which has exposed another person to a risk of harm.

"By and large, then, men owe a duty to use care in connection with their affirmative conduct, and they owe it to all who may foreseeably be injured if that conduct is negligently carried out."

Previous decisions by this court are consistent with this analysis. In *Reynolds v. Nichols,* 276 Or 597, 556 P2d 102 (1976), one of the two principal cases relied upon by defendants, the plaintiff was a social guest in the house of the defendants' neighbor. Defendants served liquor to one of their guests, who then assaulted and stabbed the plaintiff. The basis for the decision by this court in that case was that the allegations of the complaint relating to defendants' *failure to act* were insufficient to impose a *duty* to the plaintiff. Indeed, the court expressly noted that the complaint in that case did not allege that defendants had engaged in *affirmative acts* which they should have foreseen might involve an unreasonable risk of harm to another. Thus, this court said, at 600-601:

> "The allegations that defendants *failed to give warning* of Simmons' intent to assault plaintiff and to *restrain Simmons* do not state a cause of action. As we said in Cramer v. Mengerhausen, 275 Or 223, 227, 550 P2d 740, 743 (1976), '[t]here is *no duty to aid one in peril in the absence of some special relation* between the parties which affords a justification for the creation of the duty.' In the present case the complaint does not allege any special relationship between defendants and plaintiff which would give rise to a duty to plaintiff.
>
> "*If the complaint had alleged that defendants served intoxicating liquors to Simmons with reason to know that the combination of liquor and Simmons' violent propensities would prompt him to assault plaintiff* [*i. e.,* affirmative acts], it is arguable that a cause of action might have been stated. But the complaint does not make such an allegation * * *."
> (Emphasis added)[2]

---

[2] An annotation cited by defendants in 10 ALR 3d 619, "Private Persons Duty and Liability for Failure to Protect Another Against Criminal Attack by Third Person" (1966) is distinguishable for the same reasons.

To the same effect, in *Brennan v. City of Eugene,* 285 Or 401, 591 P2d 719 (1979), it was held that the negligent grant of a business license to a taxi company who had not presented proof of adequate liability insurance as required by city ordinance was an *affirmative act* rather than a *failure to act.* In rejecting defendant's arguments for limited duty and the authorities cited therefore, this court said at 409:

> "These cases, which involve a *failure* on the part of public officials *to act* at all, involve considerations quite different from those involved in a case such as this, where an act is alleged to have been performed and performed negligently. As a general rule, *one is held to a higher standard of care when he affirmatively acts than when he fails to act at all.*"(Emphasis added)

The other principal case relied upon by defendants in support of their contention that a "special relationship" is necessary is *Allen v. Shiroma/Leathers,* 266 Or 567, 514 P2d 545 (1973). In that case plaintiff stopped at the scene of an accident involving defendant's car and became engaged in directing traffic. While doing so he noticed that his own car was impeding traffic and asked a young man to move it for him. In doing so, the young man drove it into the plaintiff. In its opinion in that case the court said nothing about a requirement of any "special relationship," but analyzed the problems presented in terms of whether the injury was foreseeable under the test stated in *Stewart v. Jefferson Plywood Co.,* 255 Or 603, 609, 469 P2d 783 (1970), as discussed below.

(c) *Regardless of either "special relationship" or the distinction between "affirmative conduct" and "failure to act," the test is one of "foreseeability."*

In recent years probably most of the decisions of this court have not analyzed the problem of "duty" in negligence cases in terms of either "special relationships" or in terms of "affirmative conduct" vs "failure to act," but in terms of "foreseeability."

[556]

Thus, in *Stewart v. Jefferson Plywood Co.,* 255 Or 603, 608-9, 469 P2d 783 (1970), Justice O'Connell quoted with approval from 1 Harper & James, The Law of Torts, *supra,* the statement that:

> " "* * * liability is confined to harms actually resulting that are of the general kind to be anticipated from the conduct and, for the same reason, liability is confined to situations in which the person harmed is one of the general class threatened." '

Justice O'Connell then went on (at 609) to state that:

> "This idea of limiting liability to that which can be anticipated is formulated into *the foreseeability test for negligence,* which states that one is negligent only if he, as an ordinary reasonable person, ought reasonably to foresee that he will expose another to an unreasonable risk of harm. * * *" (Emphasis added)

This analysis has been subsequently approved by this court in more recent cases. *See, e.g., Gunn v. Hi-C-Home, Inc.,* 260 Or 404, 407-8, 490 P2d 999 (1971); *Allen v. Shiroma/Leathers,* 266 Or 567, 514 P2d 545 (1973); *Sabolish v. Playland Shows,* 267 Or 339, 341, 516 P2d 1271 (1973); *Kirtland v. Davis,* 276 Or 613, 615-16, 555 P2d 1262 (1976), and *Connolly v. Bressler,* 283 Or 265, 268, 583 P2d 540 (1978).

This brings us to the second contention by defendants—that the stabbing of plaintiff's decedent by Thompson was not foreseeable, in that it occurred through a "concatenation of highly unusual circumstances," and the contention by Justice Peterson that there must be, prospectively, a "recognizable high degree of risk of harm" from the future misconduct of a third person.

■ *Defendants' contentions that the harm was not foreseeable.*

(a) *The test to be applied.*

[557]

According to the opinion by Justice Peterson: "There must be prospectively a 'recognizable high degree risk of harm' from the future misconduct of the third person, before liability ensues." In support of that test he quotes from Restatement of Torts (Second) § 302B, comment *e.* His opinion recognizes, however, in quoting from comment *a* under § 449 that the actor becomes negligent in such a case where, among other things, "his conduct has created or increased the risk of harm through the misconduct" of a third person. Restatement "rules" and "comments" are not the law of Oregon, however, unless and until they have been approved and adopted by this court as the law of this state.

This court, in an opinion by O'Connell, J., in *Stewart v. Jefferson Plywood, supra,* stated the test to be applied in such cases (at 609-610) in somewhat different terms. As previously noted, this court stated in that case that the "foreseeability test for negligence" in such cases is whether "an ordinary reasonable person ought reasonably to foresee that he will expose another to an *unreasonable risk of harm"* and that this test is applicable to harms *"of the general kind to be anticipated from the conduct"* and to "situations in which the person harmed is one of the general class threatened." To the same effect, *see Allen v. Shiroma/Leathers, supra,* at 571-72. More recently, in *Connolly v. Bressler,* 283 Or 265, 268, 583 P2d 540, 542 (1978), we again said that:

> "Resolution of the question is usually determined by whether the harm was 'foreseeable,' *i.e.,* whether *the actual harm caused was of the general kind to be anticipated* from the blameworthy act. *Stewart v. Jefferson Plywood Co.,* 255 Or 603, 606-10, 469 P2d 783 (1970). If it was, liability results even though the particular manner of the injury could not be anticipated.
>
> "* * * * *
>
> "The bizarre manner of the occurrence does not prevent the accident from falling into the general

category of risk reasonably to be anticipated. * * *" (Emphasis added)

(b) *The role of the court and jury in the application of this test.*

As recognized in *Jefferson Plywood,* the more difficult problem arises in the application of that test to the facts of a particular case and, in particular, in determining the proper role of the court and that of the jury in such cases.

I agree that in such cases it is the duty of the court to decide, as a matter of law, whether sufficient facts have been alleged or proved by the plaintiff to entitle him to have his case submitted to the jury. My disagreement with the opinion by Peterson, J., is, perhaps, primarily a matter of emphasis and application rather than of terminology.

His opinion would emphasize the statement in *Jefferson Plywood,* at 609 (and repeated in *Allen v. Shiroma/Leathers, supra,)* that:

"* * * fault, as the term is usually understood, is not associated with conduct which causes harm through the concatenation of highly unusual circumstances. If, in our appraisal of the community's conception of fault, we find that the conduct in question clearly falls outside the conception, we are charged with the duty of withdrawing the issue from the jury."

This court also said in *Jefferson Plywood* (at 611):

"If we could say that defendant's conduct would not be deemed blameworthy according to the community's sense of fault, we would not permit the jury to impose liability."

In discussing the question of the role of the court and jury in such cases, however, this court said in *Jefferson Plywood* (at 609-10) that:

"The specific question before us is, then, whether plaintiff's injury and the manner of its occurrence was so highly unusual that we can say as a matter of law that a reasonable man, *making an inventory of*

[559]

*the possibilities of harm which his conduct might produce,* would not have reasonably expected the injury to occur. Stated in another way, the question is whether the circumstances are *out of the range* within which a jury could determine that the injury was reasonably foreseeable."

And, at p. 607-608:

"*The jury is given a wide leeway in deciding whether the conduct in question falls above or below the standard of reasonable conduct deemed to have been set by the community.* The court intervenes only when it can say that the actor's conduct clearly meets the standard or clearly falls below it.

"Implicit in this process is the assumption that judges as well as juries know something about the kind of conduct that is deemed acceptable or not acceptable in the community and that, at least at the higher and lower ends of the continuum of that standard, the court can say that the conduct does or does not meet the standard." (Emphasis added)

As also stated by O'Connell, J., specially concurring in *Dewey v. A.F. Klaveness & Co.,* 233 Or 515, 536, 379 P2d 560 (1963), quoting with approval from Prosser, Torts (2d ed 1955) p. 282:

"In any case where there might be reasonable difference of opinion as to foreseeability of a particular risk, the reasonableness of the defendant's conduct with respect to it, or the normal character of an intervening cause, the question is for the jury, subject of course to suitable instructions from the court as to the legal conclusion to be drawn as the issue is determined either way. * * *"

This is consistent with the well established rule in Oregon that a court, in considering the sufficiency of evidence in an action at law, must submit the question to the jury unless it can affirmatively say that "reasonable minds could not differ" on the matter.[3]

---

[3] *See, e.g., Hills v. McGillvrey,* 240 Or 476, 482, 402 P2d 722 (1963); *Sworden v. Gross,* 243 Or 83, 87, 409 P2d 897 (1966); *Ballard v. Rickabaugh Orchards, Inc.,* 259 Or 200, 203-4, 485 P2d 1080 (1971); *Oregon Auto. Ins. Co. v. Fitzwater,* 271 Or 249, 258-59, 531 P2d 894 (1975); *Link v.*

(c) *Application of test to facts of this case.*

(1) *"Risk of harm"—"general kind"* of harm to be anticipated.

Upon the application of these rules of law to the facts as alleged by the complaint in this case, I believe that a jury could reasonably find that when the matron responsible for the security of the juvenile detention center "permitted and assisted" Thompson to enter the detention center at night to visit a young woman being held there with knowledge that he had a "close personal relationship" with her and that the two of them had previously stolen an automobile together and "fled the county," a competent matron or jailer "ought reasonably to foresee that [she would] expose another [not only] to an unreasonable risk of harm," in the words of *Jefferson Plywood,* but to a "recognizable high degree of risk of harm," in the words of the opinon by Justice Peterson.

More specifically, a jury could reasonably find that under these facts it was not only likely that Thompson would attempt to help his girl friend escape from the detention center and again steal a car and attempt to "flee the county," but that it was likely that any police officer who attempted to block their escape or to apprehend them would encounter resistance of such a nature as to expose him to either an "unreasonable risk of harm" or a "recognizable high degree of risk of harm."

*Massie, Slate,* 277 Or 715, 720, 561 P2d 634 (1977); *James v. Carnation Co.,* 278 Or 65, 69, 562 P2d 1192 (1977), and *Thomas v. Inman,* 282 Or 279, 287, 578 P2d 399 (1978).

As also stated in comment *b* under Restatement of Torts (Second) § 453 relating to the "function of the court" in such cases:

"*If* * * * the negligent character of the third person's intervening act or the reasonable foreseeability of its being done (see §§ 447 and 448) is a factor in determining whether the intervening act relieves the actor from liability for his antecedent negligence, and *under the undisputed facts there is room for reasonable difference of opinion as to whether such act was negligent or foreseeable, the question should be left to the jury.* " (Emphasis added)

In other words, jurors, as men and women of the world, could reasonably find that just as danger invites rescue, escape from jail by an inmate, aided by a confederate, invites resistance to capture; that inmates in jails and their confederates who are desperate enough to plan and execute an escape from a jail are also desperate enough to physically resist attempts to block their escape by any means available to them and that, as a result, a police officer who attempts to block an escape will be exposed to both an "unreasonable risk of harm" and a "recognizable high degree of risk of harm."

For these same reasons I also believe that a jury could reasonably find from these alleged facts that the stabbing of such a police officer by either the escaping prisoner or his or her confederate was a "harm of the general kind to be anticipated." This being so, the question of "foreseeability" in this case was properly submitted to the jury even if members of this court might believe that the "manner" in which plaintiff's decedent was killed was "bizarre," as in *Connolly v. Bressler, supra.*

(2) *The "key question."*

According to the opinion by Justice Peterson,

"* * * the key question in the case at bar is whether the murder of the plaintiff's decedent was (quoting from *Stewart, supra,* 255 Or at 609) 'so highly unusual that we can say as a matter of law that a reasonable man, making an inventory of the possibilities of harm which his conduct might produce, would not have reasonably expected the injury to occur.'

"It takes a real stretch of the imagination to say that the murder of Officer Christensen was 'reasonably to be expected' by Murphy when she 'permitted and assisted defendant Thompson in entering the center.'"

Also, according to that opinion,

"This obligation *of the court* involves the element of foreseeability (see Justice O'Connell's comment in

[562]

*Stewart v. Jefferson Plywood Co., supra,* at 609) and involves *our* determination of the boundary of community standards that a person is responsible for an injury because it could have been anticipated because there was a reasonable likelihood that it could happen." (Emphasis added)

We disagree. As Justice O'Connell stated in *Stewart:*

"If in our appraisal of the community conception of fault, we find that the conduct in question *clearly* falls outside the conception, we are charged with the duty of withdrawing the issue from the jury." (Emphasis added)

As also held by this court in many cases, the question is whether we can affirmatively say that "reasonable minds could not differ on this question."[4] Thus, the question before this court is not how a majority of the members of this court would decide the issue of "foreseeability" if they were the triers of the facts, but whether considering the "wide leeway" which must be accorded to juries in such cases, this court can affirmatively say that "all reasonable minds could not differ" on this question and "could draw but one inference."

Jurors, as men and women of the world, are expected to evaluate evidence not only in the light of their general experience, but in the light of facts generally known in the community. *See Powell v. Moore*, 228 Or 255, 262-63, 364 P2d 1094 (1961), and McCormick on Evidence 2d, 762, § 329 (1972). It is common knowledge today that many juvenile delinquents carry knives and that that problem has become so serious that ordinances and laws are enacted to prohibit the carrying of such knives.

In my view, we cannot say that a jury of reasonable men could not properly find that when this jail matron "permitted and assisted" this juvenile delinquent "punk" to enter this detention facility at night and to visit his girl friend, who was then being held there as

---

[4] *See* cases cited note 3, *supra.*

an inmate, and did so with knowledge that the two of them had previously stolen a car and "fled the county," that this jail matron, in "making an inventory of the possibilities of harm" that might result, could reasonably have expected without any "real stretch of the imagination," that Thompson was a juvenile delinquent "punk" who would not only be likely to act as a confederate for his girl friend in assisting her to escape from the detention center but that he would physically resist attempts by a police officer to block the escape; that juvenile delinquent "punks" often carry knives, and that, as a result, it was "reasonably foreseeable" that a police officer who attempted to block the escape might be stabbed by this juvenile "punk."

Conversely, we cannot properly say that "all reasonable men could not differ" on this question. Indeed, to so hold, in the face of a contrary belief by some members of this court, would be to impugn their rationality as "reasonable men."

I also believe that such a finding by a jury would not be "out of range" for a jury of reasonable men and that such a jury could properly find that the conduct of this jailer or police matron in "permitting and assisting" Thompson to enter the jail at night and to visit his girl friend with the knowledge that the two of them had previously stolen a car and attempted to "flee the county" was "blameworthy according to the community sense of fault," so as to properly "permit the jury to impose liability" under these facts.

(3) *Other Oregon cases—distinction in cases arising on demurrer.*

According to the opinion by Justice Peterson, under Oregon law no cause of action is stated. For the reasons previously stated, I disagree.

I recognize that no case has previously been presented to this court involving similar facts. As recognized by Justice Peterson, however, "the law is not an

inanimate, unmoving thing," but "must be capable of meeting the needs of a dynamic, changing society." I believe this to be not only illustrated by our decisions in other cases involving problems of "foreseeability," although under different facts, but that such a decision in this case would be consistent with and supported by our analysis of the problem of "foreseeability" in those cases.

First, in *Stewart v. Jefferson Plywood Co., supra,* it might well have been said, as in this case, that it would take a "real stretch of the imagination" to foresee that sparks from a welding operation at defendant's mill would not only cause a fire that would spread to a nearby warehouse but that plaintiff, who was at home listening to the radio, would not only offer his assistance but would then be hoisted by a forklift to the roof of the warehouse, where he would step on a corrugated plastic skylight, which would then give way, causing him to fall through and be injured. Indeed, it could have been said that plaintiff's injury in that fall resulted from a "concatenation of highly unusual circumstances," as urged by defendant in this case. Instead, this court held that the question of "foreseeability" in that case was not "out of the range" within which a jury could determine that the injury was reasonably foreseeable.

Another extreme case involving a "concatenation of unusual circumstances" was *Connolly v. Bressler,* 283 Or 265, 583 P2d 540 (1978), in which defendant allowed one Wilt to use his pickup truck. Wilt drove it to a tavern with plaintiff and plaintiff's brother. He left it outside with the keys in the ignition. Plaintiff's brother, while drunk, then started to drive the truck away. Plaintiff then, in trying to stop his brother, jumped in the bed of the truck and was injured when it ran off the road. Yet this court held that there was liability because the injury was of the "general kind" which was foreseeable, despite the "bizarre manner of the occurrence."

For other cases in which the court has held the question of "foreseeability" to be a question of fact for the jury under somewhat extreme facts, *see Mezyk v. National Repossessions, Inc.,* 241 Or 333, 405 P2d 840 (1965) (in which defendant left his key in the ignition of his car, which was then stolen by a thief and recklessly driven into the plaintiff), and *Gunn v. Hi-C-House, Inc.,* 260 Or 404, 490 P2d 999 (1971) (in which an elderly lady in a nursing home was standing near a fountain and fell when startled by the turning on of the fountain). *See also Hills v. McGillvrey,* 240 Or 476, 402 P2d 722 (1965); *Brennen v. City of Eugene,* 285 Or 401, 591 P2d 719 (1979), and *Kirby v. Sonville,* 286 Or 339, 594 P2d 818 (1979).

Defendants also contend that plaintiff's complaint was insufficient because it failed to allege that the matron knew that Thompson "posed a threat of physical harm to anyone," or that she knew of his "dangerous propensities." In my view, however, plaintiff's complaint was sufficient because a jury could properly find from the alleged facts that the matron had actual or constructive knowledge that Thompson and the girl inmate had a "close personal relationship" and that the two of them "had previously stolen an automobile together and fled the county"; that if she allowed Thompson to enter the center and visit that inmate, the two of them might well attempt to escape, and that persons attempting to escape from jail and who had previously stolen a car in an attempt to "flee the county" may well be sufficiently desperate as to be "dangerous," so as to "pose a threat of physical injury" to persons who may attempt to prevent their escape or to capture them after their escape.

It is also important to note, in considering the past decisions by this court, that a clear distinction has been made between cases in which the sufficiency of the evidence to go to the jury is raised after a trial on a motion for directed verdict or for a judgment n.o.v. and cases in which the sufficiency of the allegations of the complaint is raised by demurrer, as in this case.

In *Mezyk v. National Repossessions, supra,* this court recognized the importance of allowing the plaintiff an opportunity to present his case before ruling in the defendant's favor on the issue of foreseeability. Justice Denecke stated:

"A complaint which states that an act was done negligently is not ambiguous. It may be subject to a motion to make more definite and certain but when there is a duty to act with due care and the complaint alleges that an act was done negligently, the complaint, when tested by demurrer, states a cause of action.

"* * * * *

"Whether or not the defendant was negligent depends upon whether or not the defendant's conduct in leaving the keys in the car created a likelihood of harm to the plaintiff. This question in turn can be subdivided: (1) Should the defendant have foreseen that someone might very well steal his car because he left the keys in it; and (2) Should he have foreseen that the thief would drive negligently?

"* * * * *

"Under the allegations of the complaint, the plaintiff is entitled to offer any admissible evidence relevant to these two issues. We hold that it is *reasonably conceivable* that the plaintiff could introduce evidence which would enable the trier of the facts to find that the defendant should have foreseen both of these contingencies." (Emphasis added) 241 Or at 338-39.

As also held in *Brennan v. City of Eugene, supra:*

"Because this case is before us on demurrer, we must assume the truth of all plaintiff's well pleaded allegations and any facts that might conceivably be adduced as proof of such allegations." *Citing Mezyk,* 285 Or at 405.

*See also Fred Meyer, Inc. v. Temco Metal Products Co.,* 267 Or 230, 236-37, 516 P2d 80 (1973), recognizing this same distinction.

(4) *"Escape cases" from other states.*

According to the opinion by Justice Peterson, the cases from other jurisdictions require a "recognizable

high risk of harm * * * invariably including a history of past conduct (often described as a 'propensity for violence toward others') which alerts the person having physical custody to the risk of physical harm to others in the event of an escape."[5] This statement is not accurate. Rather, in my view, these cases demonstrate a trend away from rigid rules dealing with what actions are and are not foreseeable and a movement toward a review of each case to determine the actual foreseeability presented by the facts involved. Indeed, in an annotation discussing these cases in 44 ALR 3d 899 it is stated, at 901:

> "The foreseeability of the escapee's actions appears to be the primary determinant of the public authorities' liability to a third person for the consequences of those actions."

Even if it be true, as stated by Justice Peterson, that all previous cases have involved escaped prisoners with a "history" of "propensity for violence," it does not follow that liability must be limited to such cases. The courts apparently have not previously been presented with a case involving an escape engineered by a confederate.

■ *Defendants' Contention of "Superseding Cause."*

Defendants' final contention is that the act of Thompson as a third party was a criminal act and, as such, constituted a superseding cause which "broke the chain" of legal causation and relieved defendants from liability.[6] In support of that contention, defendants rely upon Restatement of Torts, *supra,* §§ 440,

---

[5] Justice Peterson cites twelve cases: *State of West Virginia v. Fidelity and Casualty Co. of New York,* 263 F Supp 88 (SD W Va 1967); *Azcona v. Tibbs,* 190 Cal App 2d 425, 12 Cal Rptr 232 (1961); *Green v. State,* 91 So 2d 153 (La App 1956); *Cappel v. Pierson,* 15 La App 524, 132 So 391 (1931); *Webb v. State,* 91 So 2d 156 (La App 1956); *Geiger v. State,* 242 So 2d 606 (La App 1970); *Walker v. Interstate Fire and Casualty Co.,* 334 So 2d 714 (La App 1976); *Graham v. State,* 354 So 2d 602 (La App 1978); *Frank v. Pitre,* 353 So 2d 1293 (La 1977); *Moss v. Bowers,* 216 NC 546, 5 SE 2d 826 (1939); *Williams v. State,* 308 NY 548, 127 NE 2d 545 (1955); *Hullinger v. Worrell,* 83 Ill 220 (1876). *See also Rum River Lumber Co. v. State of Minnesota,* 282 NW2d 882 (1979).

[6] Similarly, it is contended by Peterson, J., that "no cause in fact relationship exists between the death of plaintiff's decedent and the acts of negligence as alleged in the complaint."

441 and 442.[7] By supplemental brief defendants also cite § 302B and comments and illustrations under that section.

§ 302B states the following rule:

"An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."

---

[7] Restatement of Torts 2nd § 440 (1965) provides:

"A superseding cause is an act of a third person or other force by which its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."

§ 441 provides:

"(1) An intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed.

"(2) Whether the active operation of an intervening force prevents the actor's antecedent negligence from being a legal cause in bringing about harm to another is determined by the rules stated in §§ 442-453."

§ 442 provides:

"The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:

"(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

"(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

"(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

"(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

"(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

"(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion."

In my view, the rule as stated in § 302B gives greater support to plaintiff in this case than to defendants' contention that the criminal act of Thompson was a "superseding cause."[8]

As also previously noted, comment *b* under § 453, relating to the "function of court," states as follows:

"* * * If * * * the negligent character of the third person's intervening act or the reasonable foreseeability of its being done (see §§ 447 and 448) is a factor in determining whether the intervening act relieves the actor from liability for his antecedent negligence, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was negligent or foreseeable, *the question should be left to the jury."* (Emphasis added)

For reasons previously stated, I am of the opinion that under the facts as alleged in plaintiff's complaint, the likelihood that Thompson, in assisting his girl friend to escape from the detention center (itself a criminal act), might act in such a manner as to cause harm to a person encountered during the course of such an escape was one of the hazards which a jury could properly find to make negligent the conduct of the matron in allegedly permitting or assisting him to enter the detention center at night, with actual or constructive knowledge of his "close personal relationship" with the inmate and of the fact that they had "previously stolen an automobile together and fled the county."

Defendants' reliance upon concepts of superseding causation is also misplaced for another reason. Beginning with *Dewey v. A.F. Klaveness and Co.,* 233 Or 515, 379 P2d 560 (1963), and culminating in *Stewart v. Jefferson Plywood Co.,* 255 Or 603, 469 P2d 783 (1970), this court has decided to no longer determine the limits of one's liability through concepts of proximate or legal causation. Rather the definition of negligence is used to determine the limits of liability.

---

[8] *See* Restatement, *supra,* § 302B, comments *e* (quoted above) and *f.*

As stated by O'Connell, J., in *Stewart v. Jefferson Plywood Co., supra,* at 606:

> "The scope of the liability of an actor whose conduct is a substantial factor in causing an injury is frequently discussed under the rubric 'proximate cause' or 'legal cause,' and less frequently as a part of the definition of negligence. We have adopted the latter approach."

For these reasons, I would affirm the holding by the Court of Appeals that the trial court erred in sustaining defendants' demurrer to plaintiff's complaint. I would not hold that there is liability in every case in which a jailer or jail matron permits a visitor to visit an inmate, followed by an escape in the course of which someone is injured. I would hold, however, that this plaintiff should have the opportunity under the allegations of her complaint to proceed to trial and to introduce evidence of facts and circumstances which may permit the jury to find that this matron should have reasonably foreseen that by permitting Thompson to enter the detention center at night and to visit his girl friend the two of them might well attempt to escape and that, as a result, a police officer might well be hurt. *Cf. Mezyk v. National Repossessions, supra,* 241 Or at 340.[9]

**PETERSON, J.,** concurring in part; dissenting in part.

This case has evoked more than a little interest from the members of this court and has resulted, because of the disqualification of one of our members, in a three to three amiable disagreement.

This dissenting opinion sets forth the reasons supporting the affirmance of the trial court's ruling.

---

[9] At oral argument and in supplemental briefs permitted by this court, defendants for the first time make the contention that ORS 420.005 *et seq* and 420.855 *et seq,* relating to juvenile training schools and youth centers, has some application to this case. Because that contention was not raised until this time, and because it may involve questions of fact, I would decline to decide the merits of that contention.

*There is no precedent allowing recovery under facts similar to those at bar*

At the outset, I will concede that the law is not an inanimate, unmoving thing. Quite the contrary, the law must be capable of meeting the needs of a dynamic, changing society. And merely because no court has allowed recovery under the facts alleged is not necessarily dispositive. But the collective judgment of appellate judges from the other 49 states is worthy of some respect.

I have attempted to find and read every case involving claims against public bodies arising from the acts of escaped prisoners. *Most* jurisdictions deny recovery out of hand. *No* jurisdiction has allowed recovery under the facts alleged in the plaintiff's complaint. Should we be the first to allow recovery? I think not.

A list of the cases involving claims against public bodies arising from the acts of escaped prisoners is in the margin.[1] An analysis of these cases reveals:

1. In every case in which recovery was allowed, there was a custodial relationship between the escaping prisoner and the person or entity sought to be held liable.

2. In every case allowing recovery, a recognizable high risk of harm existed, invariably including a history of past conduct (often described as a "propensity for violence toward others") which alerts the person having physical custody to the risk of physical harm to others in the event of an escape.

Not one of these factors exists here. There was no custodial relationship between Murphy and Thompson. Thompson had no record of violent conduct. No

---

[1] *Frank v. Pitre,* 353 So 2d 1293 (La 1977); *State v. Silva,* 86 Nev 911, 478 P2d 591 (1971); *Geiger v. State,* 242 So 2d 606 (La App 1970); *Green v. State,* 91 So 2d 153 (La App 1956); *Webb v. State,* 91 So 2d 156 (La App 1956); *Williams v. State,* 308 NY 548, 127 NE2d 545 (1955); *State of West Virginia v. Fidelity & Casualty Co. of New York,* 263 Fed Supp 88 (DC W Va 1967); *Azcona v. Tibbs,* 190 Cal App 2d 425, 12 Cal Rptr 232 (1961); *Moss v. Bowers,* 216 NC 546, 5 SE2d 826 (1939); *Hullinger v. Worrell,* 83 Ill 220 (1876); Annot., 44 ALR3d 899, Liability—Harm by Escaped Prisoner (1972).

facts are alleged which would put Murphy on notice that Thompson would kill the plaintiff's decedent.

### Necessity for Custodial Relationship

The rule that a custodial relationship must exist is stated in Restatement of Torts (Second), § 315:

> "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> "(b) a special relation exists between the actor and the other which gives to the other a right to protection."

The type of "special relation" contemplated by Section 315 is further defined in Section 319, which reads:

> "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

It is the custodial relationship which gives rise to the duty. Absent this relationship, no duty exists to control the conduct of the criminal actor.

### There must be a "recognizable high degree of risk of harm"

If there is one thing that the cases and Restatement make clear, it is that a mere "risk of harm" is *not* sufficient to create liability. There must be, *prospectively,* a "recognizable high degree risk of harm" from the future misconduct of the third person, before liability ensues.

In every case where recovery has been allowed (and in many cases where recovery was *not* allowed), there was evidence, from the previous record of the escaping criminal, that the criminal in custody was peculiarly likely to inflict harm upon others. For example, in *Williams v. State,* 308 NY 548, 127 NE2d 545, 550,

(1955), the New York Court of Appeals, in rejecting recovery, noted that there was nothing in the criminal's record to give "any indication that he was likely to wander from the prison and assault members of the public." The Louisiana Court of Appeals, in allowing recovery in *Frank v. Pitre,* 341 So 2d 1376, 1379, 1380 (La App 1977), noted that the escaped person "was a known criminal with a propensity for violence toward others."[2]

The Restatement also sets forth a restrictive rule.

Comment *d* to Section 302B states:

> "Normally the actor has much less reason to anticipate intentional misconduct than he has to anticipate negligence. In the ordinary case he may reasonably proceed upon the assumption that others will not interfere in a manner intended to cause harm to anyone. This is true particularly where the intentional conduct is a crime, since under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law. Even where there is a recognizable possibility of the intentional interference, the possibility may be so slight, or there may be so slight a risk of foreseeable harm to another as a result of the interference, that a reasonable man in the position of the actor would disregard it."

The editors go on to say (Comment *e*), page 90, Section 302B Restatement (Second):

> "There are, however, situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal misconduct of others. In general, these situations arise *where the actor is under a special responsibility toward the one who suffers the harm,* which includes the duty to protect him against such intentional misconduct; or where the actor's own affirmative act has created or *exposed the other to a recognizable high degree of risk of harm through such misconduct,* which a reasonable man would take into account. * * *" (Emphasis added.)

_____
[2] *Frank v. Pitre,* 341 So 2d 1376 (La App 1977), was reversed on other grounds, 353 So 2d 1293 (La 1977).

As an example of a situtation where there is a "recognizable high degree of risk of harm," the Restatement contains the following (F and H to 302B):

> "F. Where the actor has taken charge or assumed control of a person whom he knows to be *peculiarly likely* to inflict intentional harm upon others." (Emphasis added.)

> "H. Where the actor acts with knowledge of peculiar conditions which create a *high degree of risk of intentional misconduct.*" (Emphasis added.)

There is no doubt that Restatement of Torts (Second), § 449, states that liability can arise from the act of a third person, even though it is "intentionally tortious, or criminal." However, stringent limitations are placed upon this rule. See Comment *a:*

> "* * * [T]he mere possibility or even likelihood that there may be such misconduct is not in all cases sufficient to characterize the actor's conduct as negligence. It is only where the actor is under a duty to the other, because of some relation between them, to protect him against such misconduct, or where the actor has undertaken the obligation of doing so, or his conduct has created or increased the risk of harm through the misconduct, that he becomes negligent."

*Under Oregon Law No Cause of Action is Stated*

Four recent Oregon cases discuss the test of foreseeability vis-a-vis (1) the determination of whether the defendant is negligent; (2) the determination of whether the defendant's negligence is the proximate cause of the injury; and (3) the allocation of the determination between the court and jury. Those four cases are *Dewey v. A. F. Klaveness & Co.,* 233 Or 515, 379 P2d 560 (1963); *Mezyk v. National Repossessions,* 241 Or 333, 405 P2d 840 (1965); *Stewart v. Jefferson Plywood Co.,* 255 Or 603, 469 P2d 783 (1970); *Allen v. Shiroma/Leathers,* 266 Or 567, 514 P2d 545 (1973).

In *Dewey v. A. F. Klaveness & Co., supra,* Justice O'Connell wrote a lengthy concurring opinion in which he pointed out that the "test of foreseeability" is applicable "not only in determining whether defendant is

negligent, but also in determining whether his negligence is the proximate cause of the injury." 233 Or at 527.

Justice O'Connell opined (233 Or at 539):

"* * * [T]he law of causation under existing practice is so ill-defined and confused that it offers little or no aid either to the courts or to the juries in the solution of the problems of liability * * *. The principal source of confusion is the treatment of causation, both as a *factual* concept, i.e., as to whether defendant's conduct is physically connected with the injury, and as a *liability* concept, i.e., as to whether, under the circumstances, the defendant should be held liable for the injury he caused. In present practice these two concepts are fused together in one expression 'proximate cause' and as a consequence both concepts become confused. To avoid this confusion I have separated the issue of *factual* causation from all other questions involved in the case and avoided the use of the term 'causation' in any other sense. The issue of factual cause involves only the question of whether defendant's conduct was a substantial factor in producing the injury of which plaintiff complains. That is to be regarded as a pure question of fact. It calls for no judgment as to whether defendant is to be held liable for what he factually caused. * * *" (Emphasis in opinion; footnote omitted.)

Ultimately, Justice O'Connell's doctrine, first articulated in *Dewey v. A. F. Klaveness & Co., supra,* was adopted as the law of Oregon. *See Stewart v. Jefferson Plywood Co., supra.* In that case, the opinion was written by Justice O'Connell, who wrote (255 Or at 606):

"The scope of the liability of an actor whose conduct is a substantial factor in causing an injury is frequently discussed under the rubric 'proximate cause' or 'legal cause,' and less frequently as a part of the definition of negligence. We have adopted the latter approach. Whatever language is used to categorize the problem, the injury is essentially the same: (1) what factors are relevant in setting the

[576]

limits of liability for conduct which is a cause, in a substantial sense, of an injury, and (2) what are the respective functions of the court and jury in passing upon the question of the defendant's liability?" 255 Or at 606.

"The temptation here is to leave the question to the jury where the problem can be solved by an intuitive process, thus relieving us from the judicial task of reaching a reasoned conclusion. Unfortunately, however, we have inherited the duty to exercise control over the jury and to keep it within the bounds set for it, vague as they may be." 255 Or at 607.

"This idea of limiting liability to that which can be anticipated is formulated into the foreseeability test for negligence, which states that one is negligent only if he, as an ordinary reasonable person, ought reasonably to foresee that he will expose another to an unreasonable risk of harm. Foreseeability is an element of fault; the community deems a person to be at fault only when the injury caused by him is one which could have been anticipated because there was a reasonable likelihood that it could happen.

"Thus fault, as the term is usually understood, is not associated with conduct which causes harm through the concatenation of highly unusual circumstances. If, in our appraisal of the community's conception of fault, we find that the conduct in question clearly falls outside the conception, we are charged with the duty of withdrawing the issue from the jury.

"The specific question before us is, then, whether plaintiff's injury and the manner of its occurrence was so highly unusual that we can say as a matter of law that a reasonable man, making an inventory of the possibilities of harm which his conduct might produce, would not have reasonably expected the injury to occur. Stated in another way, the question is whether the circumstances are out of the range within which a jury could determine that the injury was reasonably foreseeable." 255 Or at 609.

Finally, we come to *Allen v. Shiroma/Leathers,* 266 Or 567, 514 P2d 545 (1973). The opinion was written

by Justice Denecke, who began his discussion with this question (266 Or at 569):

"* * * By what criteria should the extent of defendant's liability be determined, and does the judge or the jury make the determination?"

On page 571, Justice Denecke pointed out that the determination of the standard [one might also call it the "drawing of the line"] represents the general level of moral judgment of the community. He pointed out that "this basic concept of blameworthiness * * * [includes] an anticipation of *general* kinds of harm to persons in the *general* class threatened." (Emphasis added.) However, in "drawing the line," conduct is excluded "which causes harm through the concatenation of highly unusual circumstances."

Justice Denecke concluded with a reference to Restatement of Torts (Second), § 435(2):

"The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm."

From these four cases, it is clear that it is not correct to simply say that "foreseeability is normally a jury question." In every case, the court has a threshold obligation to determine whether the fault of the defendant is actionable. This obligation *of the court* involves the element of foreseeability (see Justice O'Connell's comment in *Stewart v. Jefferson Plywood Co., supra* at 609) and involves our determination of the boundary of community standards that a person is responsible for an injury because it could have been anticipated because there was a reasonable likelihood that it could happen. In making this determination, fault-associated conduct excludes conduct "which causes harm through the concatenation of highly unusual circumstances."

Obviously, the key question in the case at bar is whether the murder of the plaintiff's decedent was

(quoting from *Stewart, supra,* 255 Or at 609) "so highly unusual that we can say as a matter of law that a reasonable man, making an inventory of the possibilities of harm which his conduct might produce, would not have reasonably expected the injury to occur."

It takes a real stretch of the imagination to say that the murder of Officer Christensen was reasonably to be expected by Murphy when she "permitted and assisted defendant Thompson in entering the center."

I concur with the court's opinion in its analysis of ORS 30.270.

**HOLMAN, J.,** concurring in part.

I concur in that part of Justice Peterson's opinion which holds that there was insufficient "recognizable risk of harm" alleged to establish liability. To additionally point out the weakness of the opposing opinion, let us suppose that Thompson was himself the prisoner and was allowed to escape by an act of Murphy. No logical difference, insofar as Murphy's liability is concerned, could be based upon the fact that Thompson helped the prisoner to escape, rather than being the escaping prisoner himself. If such were the case, we would then be faced with whether there is a "recognizable high degree of risk of harm [the opposing language quoted from comment *c* under § 302.B of the Restatement (Second) of Torts]" that a person who has run away from home and stolen a car would commit a serious physical assault with a deadly weapon if allowed to escape. No one has pointed to any case in the United States where liability has been based upon such a state of facts.

If it became law, the opposing opinion would have serious consequences in that every escape from custody in which the escapee inflicts harm would present a jury case. It is not likely that anyone is going to be in jail who has less a record for violence than Thompson

had. If this case makes a jury question on the degree of risk, almost any case will. How far the opposing opinion has gone is proved by the fact that it has not cited one case in which an appellate court has gone as far as it proposes to go in imposing liability.